## Case No. 16,515.

### UNITED STATES v. THREE TONS OF COAL.

[6 Biss. 379;[1] 21 Int. Rev. Rec. 251.]

District Court, E. D. Wisconsin. July, 1875.

FORFEITURE AGAINST DISTILLERY—CONSTRUCTION OF STATUTES—POWER OF GOVERNMENT—PERSONAL AND CONSTITUTIONAL RIGHTS—CERTAINTY OF DESCRIPTION—PRESENCE OF CLAIMANTS.

1. A proceeding against a distillery for forfeiture under the revenue laws, is not a criminal proceeding within the meaning of the constitution.

[Cited in Dobbins' Distillery v. U. S., 96 U. S. 399.]

2. The true test is, whether the judgment is of punishment. against the person, or of forfeiture. against the res.

3. Section 860 of the United States Revised Statutes is modified and partially repealed by the act of June 22, 1874 (Rev. St. U. S. 1874, p. 162).

4. The revenue law is not, properly speaking, a penal statute to be construed with strictness in favor of the defendant.

5. If the legislative protection against a witness' evidence being used against himself, is as broad as the constitutional provision against compelling a person to criminate himself, he can be compelled to answer.

[Cited in U. S. v. Shapleigh, 4 C. C. A. 237, 54 Fed. 132; Boyd v. U. S., 6 Sup. Ct. 535, 116 U. S. 635.]

6. The complete superintending control of the business of distillers and rectifiers is exercised by the government, and when they enter the business they contract to submit to this governmental surveillance.

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

7. It is no infringement of personal or constitutional rights for the government, under the act of June 22, 1874, to require the production of, and, if necessary, seize any or all the books and papers kept by them in their business. They are not such private property as to be exempt from seizure and search, nor are they protected by the rules against obtaining from a party evidence to be used against himself. The government has really an interest in such business, as affecting the public revenues.

8. The discretion of the court in requiring books and papers to be produced, should not be exercised in favor of the claimants, when no special circumstances are shown by them.

9. The books and papers are not required to be more specifically described than as those used and kept in their business as distillers or rectifiers, between certain dates named.

10. The claimants and their counsel have the right to be present at the examination of their books and papers.

11. Many cases cited and commented upon.

J. C. McKinney and L. S. Dixon, for the United States.

Matt. H. Carpenter, for claimants.

DYER, District Judge. Informations having been filed in this court, on behalf of the United States, in several causes of seizure under the internal revenue laws, orders were made requiring the claimants in the respective cases, to produce certain books and papers, for examination by the attorneys of the United States. On the day named in the orders for the production of these books and documents, the claimants appeared by their counsel to contest the right of the government to take these proceedings, and in the Case of Schœnfeld, who is alleged to be a rectifier of distilled spirits, moved to vacate the order previously made in that case. The act of June 22, 1874, to "amend the customs revenue laws and repeal moieties" (18 Stat. 186), provides, in the fifth section: "That in all suits and proceedings, other than criminal, arising under any of the revenue laws of the United States, the attorney representing the government, whenever, in his belief, any business book, invoice or paper belonging to or under the control of the defendant or claimant, will tend to prove any allegation made by the United States, may make a written motion particularly describing such book, invoice or paper, and setting forth the allegation which he expects to prove; and thereupon the court in which suit or proceeding is pending may, at its discretion, issue a notice to the defendant or claimant to produce such book, invoice, or paper in court, at a day and hour to be specified in said notice, which, together with a copy of said motion, shall be served formally on the defendant or claimant by the United States marshal by delivering to him a certified copy thereof, or otherwise serving the same as original notices of suit in the same court are served; and if the defendant or claimant shall fail or refuse to produce such book, invoice, or paper, in obedience to such notice, the allegations stated in the said motion shall be taken as confessed unless his failure or refusal to produce the same shall be explained to the satisfaction of the court. And if produced, the said attorney shall be permitted, under the direction of the court, to make examination (at which examination the defendant or claimant, or his agent, may be present) of such entries in said book, invoice, or paper as relate to or tend to prove the allegation aforesaid, and may offer the same in evidence on behalf of the United States. But the owner of said books and papers, his agent or attorney, shall have, subject to the order of the court, the custody of them, except pending their examination in court as aforesaid." It is under this section of the act of 1874 that these proceedings for the production of the books, papers and documents specified in the order are prosecuted.

The fourth amendment of the constitution of the United States provides, that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The fifth article declares that no person "shall be compelled, in any criminal case, to be a witness against himself;" and it is insisted that the section of the revenue law before quoted is in conflict with the guaranty of rights embodied in these amendments, and therefore void.

The question has been argued by eminent counsel with a learning and ability commensurate to its importance. On the one hand it is contended that in this proceeding there is threatened an invasion of the most sacred rights of the citizen—rights protected by the solemn guaranties of the constitution —rights that no emergency of government can justify the courts in disregarding, and an appeal has been made such as is seldom heard at the bar, that the hand of the government may be stayed, and the exercise of what is termed arbitrary power may be restrained in these proceedings, where such restraint will, as it is urged, directly operate as an enforcement of constitutional rights. On the other hand it is contended, with equal earnestness, that the power sought to be exercised here is directly incidental to the power conferred by the constitution, "to lay and collect taxes, duties, imposts and excises;" that no violation of any constitutional privilege is involved, and that the right of congress to pass the law in question, is beyond dispute.

First, in seeking a general principle needful for guidance, the language of Chief Justice Marshall may be accepted as in the highest degree authoritative: "The question whether a law be void for its repugnancy to the constitution, is at all times a question of much delicacy which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The court, when impelled

by duty to render such· a judgment, would be unworthy of its station, could it be unmindful of the solemn obligation which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other." Relieved of its verbiage, the statute in question, in terms provides, that in any proceeding other than criminal, arising under any of the revenue laws of the United States, the court in which such proceeding is pending, may at its discretion, on motion of the government attorney, require the claimant or defendant, to produce for examination, any business book, invoice or paper, belonging to or under the control of such claimant or defendant, and which, in the belief of the attorney, will tend to prove any allegation made by the United States; and on failure to produce the books and papers required, the allegations of the government may be taken as confessed. In determining whether, this act of congress is repugnant to the amendments of the constitution which have been cited, the question may be resolved into two main inquiries, to which other points presented are incidental: First. Are the suits or the proceedings in which these informations have been filed, and in which these orders were made, criminal cases within the meaning of the constitutional provision? Second. Are the books and papers called for of such· a character, as the private property of the claimants, as to be secure from search and examination by the attorneys for the government?

The spirit of the constitutional prohibition against unreasonable searches and seizures, has its source in that principle of the common law which finds expression in the maxim that "every man's house is his .castle." English history discloses as the original occasion for constitutional provisions on the subject, that they had their origin "in the abuse of executive authority, and in the unwarrantable intrusion of executive agents into the houses and among the private papers of individuals, in order to obtain evidence of political offenses." Cooley, Const. Lim. 300. The struggle in England against the right of seizing private manuscripts and papers, on warrants of search, began substantially with the resistance of Wilkes to the warrants of Lord Halifax, which culminated in the action of Wilkes against Wood, the under secretary of state. In that action, Lord Chief Justice Pratt said: "The defendant claimed a right under precedents, to force persons' houses, break open escritoires, and seize their papers upon a general warrant, where no inventory is made of the things thus taken away, and where no offenders' names are specified in the warrant, and therefore a discretionary

power given to messengers to search wherever their suspicions may chance to fall. If such a power is truly invested in a secretary of state, and he can delegate this power, it certainly may affect the person and property of every man in this kingdom, and is totally subversive of the liberty of the subject." The case of Entick v. Carrington, 19 How. St. Tr. 1030, cited by claimant's counsel, marks another step in the struggle, made in England against the right to seize private papers. That was the case of a warrant to search for and seize the papers of the accused, in the case of a seditious libel, Lord Camden delivering the judgment of the court. He says of the great point involved in that cause, that if it "should be determined in favor of the jurisdiction, the secret cabinets and bureaus of every subject in this kingdom will be thrown open to the search and inspection of a messenger whenever the secretary of state shall think fit to charge, or even to suspect, a person to be the author, printer, or publisher of a seditious libel. * * * There is no process against papers in civil causes. It has been often tried, but never prevailed. * * * In the criminal law, such a proceeding was never heard of, and yet there are some crimes, such, for instance, as murder, rape, robbery and housebreaking, to say nothing of forgery, and perjury that are more atrocious than libeling. But our law has provided no paper search in these cases to help forward the conviction." Again he says, in the same judgment, "the great end for which men entered into society was to secure their property; that right is preserved sacred and incommunicable in all instances, where it has not been taken away or abridged by some public law for the good of the whole. The cases where this right of property is set aside by positive law, are various. Distresses, executions, forfeitures, taxes, etc., are all of this description, wherein every man, by common consent, gives up that right for the sake of justice and the general good." It was thus judicially determined in England, that warrants for the seizure of private papers, were illegal at the common law, and the action of parliament was not in conflict with judicial adjudication. The precise principle established was, that the citizen in his home shall have protection in his person and his papers, even against the process of the law, except in certain cases. Cooley, Const. Lim. 300. Chatham in his speeches on general warrants declared the scope and application of the principle, when he said, "the poorest man may, in his cottage, bid defiance to all the forces of the crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter: the rain may enter; but the king of England may not enter; all his force dares not cross the threshold of the ruined tenement."

Other decisions, many of which were cited on the argument, and some of which will be particularly noticed, accomplished the permanent overthrow in England, of the right at

common law to search for and seize the private papers of the citizen, for the purpose of convictions for crime, or for the purpose of recovery in civil causes, where the evidence when produced would convict of a felony. [Chetwind v. Mernell, Exr. 1 Bos. & P. 271;] [2] Rex v. Dixon, 3 Burr. 1687; Rex v. Purnell, 1 Wils. 239; Reg. v. Mead, 2 Ld. Raym. 927; Rex v. Cornelius, 2 Strange, 1210. It is to be remarked, that in nearly all of these cases the attempt was made in prosecutions upon information or indictment for crime, to compel the production of the papers of the accused as ground for conviction. The proceeding was direct, and its character as a "criminal case" was clear. The case of Huckle v. Money, 2 Wils. 205, was one in which a warrant was granted by Lord Halifax, secretary of state, directed to four messengers to apprehend and seize the printers and publishers of a paper called the North Briton, No. 45. The action was trespass and the jury gave £300 damages. The Lord Chief Justice held the damages not excessive, and ordered the verdict to stand, laying stress upon the point that the warrant was granted without any information or charge laid before the secretary of state, previous to the granting thereof, and without naming any person whatsoever in the warrant, and was a violation of Magna Charta. Other cases in England will be hereafter noticed in a branch of the case which will arise for consideration. The common law rule upon this subject was thus established in England, and thus it existed and was the law of that realm, when the American colonies were organized, and when this government was formed. Under the shelter of judicial decision, the subject became secure in his person, papers and effects, against unreasonable searches and seizures, and could not be compelled to accuse himself.

The constitution of the United States, as originally adopted and ratified by the states, containing no provision expressing the principle of personal protection against searches, seizures, etc., amendments were proposed by Mr. Madison at the first session of the first congress. The purpose of these amendments has been somewhat discussed upon the argument. High authority says that they were mainly in the nature of a declaration of rights, placing the freedom of speech, the freedom of the press, freedom of religion, the security of property, personal liberty, trial by jury, and in general every right and power of the people not delegated or surrendered, under the aegis of the constitution, and by an express interdiction beyond the reach of the government. Rives' Life and Times of Madison, 39, 40. The debates in congress show that the purpose of the amendments, in the view of Mr. Madison, was, to render the constitution as acceptable to the whole people of the United States, as it had been found to be to a majority of them, and that without impairing the powers of the constitution, ap-

prehensions for the public liberty would be quieted, and the great body of the people would be united in support of that instrument. That part of the fifth amendment, discussed here, originally proposed by its author, was in the following language and stood in this connection: "No person shall be subject, except in cases of impeachment, to more than one punishment or one trial for the same offense, nor shall be compelled to be a witness against himself, nor be deprived of life, liberty or property without due process of law, etc." The debates upon this clause show that it was objected to because it "contained a general declaration in some degree contrary to laws passed. The member objecting alluded to that part where a person shall not be compelled to give evidence against himself. He thought it ought to be confined to criminal cases, and moved an amendment for that purpose, which amendment being adopted, the clause as amended was unanimously agreed to." 1 Ann. Cong. p. 782.

So we find it to have been the clear intent of the framers of the amendment, as disclosed not only in its language, but in the original debates, to restrict the provision to criminal cases, and with the adoption of the fourth and fifth amendments, principles established at the common law became reaffirmed in the constitution.

I have referred at some length to the history of the law upon this subject, and to these amendments, because it was considerably dwelt upon in the argument, and it is important that in considering the present question, we do not mistake the character of the case and the state of facts to which the law in its design and scope should be applied. What then are the cases we have here? Seizures of certain distilleries and rectifying establishments having been made by the government, for alleged violations of the internal revenue laws by distillers and rectifiers of distilled spirits, informations have been filed, upon which forfeitures of the property seized are sought to be enforced. The proceedings as they stand are against the property, are strictly in rem, and from their nature can be nothing else. They are as emphatically proceedings in rem, as a libel against a vessel. By the internal revenue laws of the United States, certain violations of those laws involve a forfeiture of the property employed, and may also involve punishment of the offending parties by fine and imprisonment. The second section of the act of March 2, 1867 (14 Stat. 547), authorized the seizure of books and papers, where complaint was made of the commission of frauds on the revenue. By the act of June 22, 1874, the fifth section of which has been quoted, the second section of the act of 1867, authorizing seizure of books and papers, was repealed; and in its place was enacted the section in question, providing for the production of books under compulsory process, "in all suits and proceedings other than criminal, arising under the revenue laws,"

[2] [From 21 Int. Rev. Rec. 251.]

which of course included suits for penalties and forfeitures. So that in place of any legislative authority for the seizure of books and papers, we have the statute and proceeding for compulsory production of books and papers now under consideration. Section 860 of Revised Statutes of United States provides that "no pleading of a party, nor any discovery or evidence obtained from a party or witness, by means of a judicial proceeding in this or any foreign country shall be given in evidence, or in any manner used against him or his property or estate in any court of the United States. in any criminal proceeding, or for the enforcement of any penalty or forfeiture." Rev. St. U. S. 1874, § 162. Undoubtedly so much of this section as relates to the use of evidence against a party for the enforcement of a penalty or forfeiture is repealed by the act of 1874, which requires the production of books and papers by. compulsory process, in any proceeding other than criminal, arising under the revenue laws. If section 860 were now in full force in its original terms there is little doubt the books and papers of these claimants could not be used against them, because they would then be evidence obtained from the claimants by means of a judicial proceeding for the enforcement of a forfeiture. In the case of U. S. v. Hughes [Case No. 15,419], Judge Blatchford excluded the books and papers of the defendants, seized upon warrant issued under the second section of the act of March, 1867, because, in the language of section 860 of the Revised Statutes, they were evidence obtained from the defendants by means of a judicial proceeding in a suit for the enforcement of penalties. That was a case arising before the passage of the act of 1874, which we are here considering. In a subsequent endeavor to apply to that case the act of 1874, Judge Blatchford held that so far as it applied to that action, it was an ex post facto law, and therefore unconstitutional and void, limiting his decision, however, to that point, and not intending, as he says, to express any opinion about that act, in its applicability to cases arising after its passage. [U. S. v. Hughes, Case No. 15,416.]

We have here, then, a judicial proceeding against certain property, for the enforcement of a forfeiture, the ground of the proceeding being alleged violation of the revenue laws of the United States. We have a constitutional provision, declaring that no person shall be compelled in any criminal case, to be a witness against himself; a statute authorizing compulsory process for the production of the books and papers of a claimant or defendant in any proceeding other than criminal, arising under the laws relating to revenue, and a further statute that no discovery or evidence obtained from a party, by means of a judicial proceeding, shall be in any manner used against him in any court of the United States, in any criminal proceeding.

The question now arises: Is the proceeding for the forfeiture of this property a criminal case, within the meaning of the constitution? It is argued that the construction of the constitutional provision should not be limited; that as some of the alleged violations of the revenue law involve not only punishment by forfeiture, but punishment, also, by fine and imprisonment, after conviction or indictment, this case is criminal in its character, within such a construction as the constitutional provision should have. The rule of constitutional construction is thus laid down by Chief Justice Marshall: "The intention of the instrument must be collected from its words; its words are to be understood in that sense in which they are generally used, by those for whom the instrument was intended; its provisions are neither to be restricted into insignificance nor extended to objects not comprehended in them, nor contemplated by its framers."

I have said that these are proceedings in rem; and it should be noticed that the cases are not like those where a forfeiture of property and a punishment by fine and imprisonment may be adjudged in the same action. Of the kind of forfeiture provided for in the statute relating to revenue, it may be said, that it is a punishment which "falls on the thing as respects ownership; and it does not visit the owner's person. Though he loses the thing, which lapses to another or the state, the loss is not in the nature of a penalty for personal crime." 1 Bish. Cr. Law, § 816. There is another kind of forfeiture, which happens when a person on conviction is sentenced to forfeit specific articles of property, instead of, or in addition to a fine. This class of forfeitures rests upon the precise principle of fines; there are also the cases of forfeiture of an office, or of the capacity to hold an office, imposed upon the person as a punishment, which must be distinguished from the kind of forfeiture we are now considering, and I think a correct apprehension of this distinction clears away many difficulties. The forfeitures we are here dealing with are such as are created by statute to enforce revenue laws, kindred to forfeiture of property used in illicit trade, to forfeitures of seamen's wages on desertion of the ship, to forfeitures incurred by violations of embargo laws. Mr. Bishop, in his work on Criminal Law (4th Ed. vol. 1, §§ 702, 709), says: "The object of these forfeitures, or, more accurately, the law's motive for inflicting them, may be akin to the peculiar spirit of either the criminal law or the civil. But whether the one or the other, the forfeiture proceeds in a way of its own, drawing its sustenance from a principle of its own, peculiar neither to the one nor to the other of these two great departments of our law. It is neither a punishment for crime, even though a crime is committed when it is incurred; nor a damage awarded for a civil injury, even though a civil liability follows the act which produces it. * * * Whenever the law, statutory or common, creates a

forfeiture of property by reason of particular circumstances attending it, or of its peculiar nature, as being dangerous to the community —by reason of any form or position which it assumes—this forfeiture is not to be deemed a punishment inflicted on its owner in the criminal law sense, and within constitutional guaranties protecting persons who are accused of crime. * .* * But if the law provides that a person shall forfeit property A. for what property B. does, or for what the owner does, in a matter not connected with the property, or for a bare intent, which does not enter into the situation and conduct of the property, the forfeiture is a punishment, which can be inflicted only on conviction of the owner, for his act or intent viewed as a crime."

I think the distinction thus indicated is grounded upon principle; and it is, in my judgment, most satisfactorily illustrated in a case not cited upon the argument, decided by Justice Story. I refer to the case of The Palmyra, 12 Wheat. [25 U. S.] 1. Justice Story says: "It is well known that at the common law, in many cases of felonies, the party forfeited his goods and chattels to the crown. The forfeiture did not, strictly speaking, attach in rem; but it was a part, or at least a consequence, of the judgment of conviction. It is plain from this statement that no right to the goods and chattels of the felon could be acquired by the crown, by the mere commission of the offense; but the right attached only by the conviction of the offender. The necessary result was, that in every case where the crown sought to recover such goods and chattels, it was indispensable to establish its right by producing the record of the judgment of conviction. In the contemplation of the common law, the offender's right was not divested until the conviction. But this doctrine never was applied to seizures and forfeitures created by statute, in rem, cognizable on the revenue side of the exchequer. The thing is here primarily considered as the offender, or rather the offense is attached primarily to the thing,—and this whether the offense be malum prohibitum or malum in se. The same principle applies to proceedings in rem, on seizures in admiralty. Many cases exist where the forfeiture for acts attaches solely in rem, and there is no accompanying penalty in personam. Many cases exist where there is both a forfeiture in rem and a personal penalty. But in neither class of cases has it ever been decided that the prosecutions were dependent upon each other. But the practice has been, and so this court understand the law to be, that the proceeding in rem stands independent of and wholly unaffected by any criminal proceeding in personam."

Now, applying this doctrine to the cases at bar, I think I speak with accuracy when I say, that in these proceedings, the distilleries and other property in question are the things which (if any offense at all has been committed) are to be primarily considered as the offenders, or rather the offenses, if any, attach primarily to them, and that these proceedings in rem stand independent of and wholly unaffected by any criminal proceeding in personam. The forfeiture is not, in an apt and legal sense, a punishment for crime, even though a crime be committed when the forfeiture is incurred. The true test, I think, lies here. When the judgment of forfeiture necessarily carries with it and as part of it a conviction and judgment against the person for the crime, the case is of criminal character. But when the forfeiture does not necessarily involve personal conviction and judgment for the offense, and such conviction and judgment must be obtained, if at all, in another and independent proceeding, there the remedy by way of forfeiture is of civil and not criminal nature. Understanding the words "criminal case," in the constitution in the sense in which they are generally used, and upon the views already indicated, I must construe them as meaning a case in which punishment for crime is sought to be visited upon the person of the offender, in the ordinary course of criminal prosecution, in contradistinction to a proceeding in rem to effect a forfeiture of the thing to which the offense primarily attaches.

Discussion was had in the course of the argument upon the question, as to whether the statute for enforcement of forfeitures in cases like the present was a penal or remedial statute. In the case of U. S. v. Breed [Case No. 14,638] Justice Story says: "Revenue and duty acts are not, in the sense of the law, penal acts, and are not therefore to be construed strictly. Nor are they, on the other hand, acts in furtherance of private rights and liberty, or remedial, and therefore to be construed with extraordinary liberality. * * * We are not to strain to reach cases not within their terms, even if we might conjecture that public policy might have reached those cases; nor, on the other hand, are we to restrain their terms, so as to exclude cases clearly within them, simply because public policy might possibly dictate such an exclusion." In the case of Taylor v. U. S., 3 How. [44 U. S.] 197, the supreme court of the United States has said: "In one sense, every law imposing a penalty or forfeiture may be deemed a penal law; in another sense, such laws are often deemed, and truly deserve to be called, remedial. It must not be understood that every law which imposes a penalty is therefore, legally speaking, a penal law, that is, a law which is to be construed with great strictness in favor of the defendant. Laws enacted for the prevention of fraud, for the suppression of a public wrong, or to effect a public good, are not in the strict sense penal acts, although they may inflict a penalty for violating them. It is in this light we view the revenue laws, and we would construe them so as most effectually to accomplish the intention of the legislature in passing them." Such are the views of the court of last resort, and they must have weight

here. Whether the statute referred to be penal or remedial, I do not think decisive of the question in dispute. But within the definitions given I construe it as bearing more a remedial than a penal character. Two cases have been cited on the argument, as in antagonism to each other upon the question under consideration. Emery's Case, 107 Mass. 172; People v. Kelly, 24 N. Y. 74. The stress laid upon the last-named case by the counsel for the government, and the earnestness with which the Massachusetts case is pressed by counsel for the claimants, justifies a somewhat close analysis of both cases.

The constitution of the state of New York provided, in the identical language of the constitution of the United States, that no person "shall be compelled in a criminal case to be a witness against himself." Hackley was a witness before a grand jury, in a matter against certain aldermen of the city of New York, and refused to answer a question, on the ground that an answer would disgrace him and have a tendency to accuse him of crime. The question was, whether he could so lawfully refuse. There was a statute of the state which provided that testimony so given should not be used in any prosecution or proceeding, civil or criminal, against the person so testifying. Judge Denio held that Hackley was not protected by the constitution from being compelled to give the testimony called for, though it might implicate him in a crime, as he was fully protected by statute, against the use of such testimony, on his own trial. He says: "It is perfectly well settled, that where there is no legal provision to protect the witness against the reading of the testimony on his own trial, he cannot be compelled to answer. People v. Mather, 4 Wend. 230. This course of adjudication does not result from any judicial construction of the constitution, but is a branch of the common law doctrine, which excuses a person from giving testimony which will tend to disgrace him, to charge him with a penalty or forfeiture, or to convict him of a crime. It is of course competent for the legislature to change any doctrine of the common law, but I think they could not compel a witness to testify on the trial of another person, to facts which would prove himself guilty of a crime, without indemnifying him against the consequences, because, I think, as has been mentioned, that by a legal construction the constitution would be found to forbid it."

In the Massachusetts case, Emery, in obedience to summons, appeared as a witness before a joint special committee of the senate and house of representatives of the general court, to inquire if the state police was guilty of bribery and corruption. In the course of his examination, he was asked this question: "Have you ever paid any money to any state constable, and do you know

of any corrupt practice or improper conduct of the state police? If so, state fully what sums and to whom you have thus paid money, and also what you know of such corrupt practice and improper conduct." He declined to answer, on the grounds that the answer would accuse him of an indictable offense, and would furnish evidence against him by which he could be convicted of such an offense. The constitution of Massachusetts provided that "no subject shall be held to answer for any crime or offense until the same is fully and plainly, substantially and formally, described to him; or be compelled to accuse or furnish evidence against himself." The dissimilarity in terms between this provision and that in the constitution of the United States, which is, that no person "shall be compelled in any criminal case to be a witness against himself," is, at a glance, apparent. The statute under which Emery was required to testify undertook to secure him against the use of any disclosures he might make, as admissions or direct evidence against him, in any civil or criminal proceeding. Now the point of the decision in this case was that, as the constitution of the commonwealth in broad and unlimited terms provided that no subject should be compelled to accuse or furnish evidence against himself, the statute securing Emery from future liability should be as broad as the constitutional shield; and as it was not, and as it did not protect him from the indirect and incidental consequences of a disclosure, he was relieved from obligation to answer the question. In the opinion of the court, Justice Wells says that no one can be required to forego an appeal to the protection of the constitution, "unless first secured from liability and exposure to be prejudiced in any criminal proceeding against him as fully and extensively as he would be secured by availing himself of the privilege accorded by the constitution. * * * This cannot be accomplished so long as he remains liable to prosecution, criminally, for any matters or causes in respect of which he shall be examined, or to which his testimony shall relate. It is not done in direct terms by the statute in question; it is not contended that the statute is capable of an interpretation which will give it that effect, and it is clear that it cannot and was not so intended to operate. Failing, then, to furnish to the persons to be examined an exemption equivalent to that contained in the constitution, or to remove the whole liability against which its provisions were intended to protect them, it fails to deprive them of the right to appeal to the privilege therein secured to them." And so it was held that Emery, in refusing to answer the question put, was in the exercise of a constitutional right. The court refer to the case of People v. Kelly, 24 N. Y. 74, in their opinion. I do not understand that they intend to express any dissent to the doctrine

laid down in that case; for Justice Wells says that the terms of the provision in the constitution of Massachusetts require a much broader interpretation than the terms of the provision in the constitution of New York, which, as we have seen, were identical with the provision in the constitution of the United States. Like the statute of New York, cited in People v. Kelly [supra], the statute of the United States declares that no evidence obtained from a party by means of a judicial proceeding, shall be in any manner used against him in any criminal proceeding. With this legislative protection, as ample as the terms of the constitution itself, I think it cannot be successfully asserted, as was done in the Massachusetts case, that the party is not as fully secured as he can be from future liability in a criminal proceeding.

Counsel for claimants cited Cattell v. Ireson, 96 E. C. L. 90. In that case, the defendant was charged upon information, with the unlawful use of two snares, for the purpose of taking game on certain land, not being authorized so to do, for want of a game certificate; and it was held in that case, that the party charged was not compellable to give evidence against himself. Lord Campbell, chief justice, and the other judges place their decision distinctly upon the ground that the information was a criminal proceeding, for an offense punishable on summary conviction; that the legislature had made the act a crime, punishable by fine or imprisonment, and the case is expressly distinguished from a fiscal proceeding, or a proceeding for a civil right, or for a wrong done to the party applying.

In Greene v. Briggs [Case No. 5,764] liquors of the plaintiff had been seized, on the ground that they were kept and deposited for purposes of sale contrary to law. The penalty in such a case was forfeiture and destruction of the property, and fine or imprisonment, and the forfeiture and punishment by fine or imprisonment were necessarily imposed in the same action; and the court hold the proceedings criminal in their nature, their object being to inflict upon the person fine or imprisonment, and at the same time to adjudicate a forfeiture of the liquors. The process and the judicial action under it, are directed both against the offender and his property, and it is held that it is not possible to separate the proceedings under the act against the property from the proceedings against the person.

The case of Fisher v. McGirr, 1 Gray, 1, was similar in character to Greene v. Briggs [supra], the forfeiture and punishment by fine or imprisonment, for violation of the law, being enforcible in the same action. The statute was held unconstitutional, because it provided for the destruction of private property and the punishment of its owner without charging him with any offense, or giving him opportunity to defend and meet the witnesses face to face. It may be said of this case, and of that in 1 Curtis, that the forfeiture provided for was, conjointly with fine or imprison-

ment, clearly made a punishment for a criminal offense. It was a forfeiture which was by the statute itself made to depend alone upon an intent in the mind of the owner of the property, which, as Mr. Bishop points out in his Criminal Law (volume 1, §§ 702, 709), is to be distinguished from a forfeiture resulting from particular circumstances attending property, imposed sometimes with and sometimes without a conviction of the owner for crime.

Obviously there cannot be a complete determination of the rights of the parties to these proceedings without considering the remaining question, which touches the character of the books and papers claimed by the respondent's counsel to be protected against search and examination. We have seen that the principle of the common law in relation to searches and seizures was established for the protection of purely private rights, and for the security against public use of private papers; that it was aimed as a prohibition against the unwarrantable intrusion into private houses of executive agents, and searches upon mere suspicion by messengers armed with general warrants. We have seen, also, that it was this principle that was incorporated into the constitution, and it is all important that the meaning of the principle, and the real purpose for which it was originally invoked by the citizen and asserted by the courts, be not lost sight of; for even in some of the English cases cited upon the argument, distinctions are drawn that must not be overlooked.

In Prichett v. Smart, 62 E. C. L. 625, the action was assumpsit on a bill of exchange drawn by one Williams upon, and accepted by, the defendant, and by Williams indorsed to the plaintiff, a sworn broker of London. The statute required every broker to keep a book of all contracts, agreements and bargains made by him. The defendant made application to require the plaintiff to produce his broker's books, and the real ground of the decision is, that the defendant had no direct interest in the book, and that if the plaintiff could be required at all to produce the book, it could only be done at the instance of his principal. It was held that the defendant was not a party to any of the transactions presumed to be entered in the book, nor was it held by the plaintiff as a trustee for him.

In Crew v. Saunders, 2 Strange, 1005, an action was brought against the defendant on the statute for intermeddling in elections, being postmaster at Nantwich. It was moved in behalf of the plaintiff for liberty to inspect the postoffice books and take a copy of his deputation. The court said that the origin of such motions was in the inspection of court rolls; "but then it was confined to the case of persons interested, the rolls being the common evidence, which of necessity must be kept in some one hand. But lords and tenants of different manors have al-

ways been denied, as strangers. In the case of public companies, it is restrained to the entry whicn concerns the party himself." The plaintiff took nothing by his motion.

In Reg. v. Mead, 2 Ld. Raym. 927, the defendant and others were incorporated by the name of surveyors of certain highways and were trustees of a charity called "Bedford's Gift." An information was preferred against the defendant for executing his office without having taken the oaths. A rule was moved for, that two books might be produced which the surveyors kept, in which they entered their elections, and their receipts and disbursements. The rule was denied, because the books were "perfectly of a private nature," and moreover the prosecution was purely criminal.

Now, as a source of revenue for the maintenance of the government, congress has enacted a law imposing certain taxes on distilled spirits, and for the purpose of enforcing payment of such taxes, has established a system, rigorous in its features and in many instances arbitrary in its operation, under which distilled spirits shall be manufactured and rectified. The law is a complete regulation of the business. To engage in the business except under statute regulation and government surveillance, is absolutely forbidden. The preliminary circumstances under which the business can be entered upon, are prescribed to the remotest detail. Applications must be made, notices and bonds must be given. The location of the establishments, with all mechanical arrangements for operating them, are prescribed, the days and hours of business, and the quantity of grain for every gallon of production are fixed, and government officers, consisting of gaugers and storekeepers, hold the keys and control the locks and seals of the furnaces, rooms. wine cisterns and storehouses, appertaining to the establishments, and employed in the business.. It is only under the rigid observation and control of these officers that spirits can be removed from one location to another, and that the owner can exercise his rights of disposition and sale. By the express terms of the law, books must be kept, showing the conduct of the business in all its details, which books are required to be always open to the inspection of the officers, and at specified times accounts must be rendered to the government from these books, and the bond which must be given is conditioned that all of these and many more provisions of law shall be faithfully complied with. All these requirements of the law are fully set out in the case of U. S. v. Singer, 15 Wall. [82 U. S.] 118, where it is said that "the system thus adopted was designed to prevent the secret production of spirits and consequent evasion of the government tax. * * * In view of the enormous frauds previously practiced upon the government, in rendering accounts, this system cannot be justly charged with unnecessary harshness."

And in this case, and in the cases of Collector v. Beggs, 17 Wall. [84 U. S.] 182, and Pahlman v. Collector, 20 Wall. [87 U. S.] 189, it is substantially held, that the producing capacity of the distillery, as fixed by the law. is the basis of taxation, rather than the actual cost of production. It may be said that these provisions of law are anomalous and severe, depriving parties of that control of their own business which every citizen should be permitted to enjoy. Undoubtedly it is true that the passage of such a law involves the exercise of extraordinary power. But its high purpose is the securing of revenue, and the authority given by the constitution on this subject is necessarily a great power because the existence of the government is dependent upon its exercise. Mandatory and rigid as the internal revenue law is, in all the provisions referred to, it has been expressly held constitutional by the supreme court of the United States in the case of U. S. v. Singer, 15 Wall. [82 U. S.] 111. In view of the provisions of the statute, it cannot be denied that complete superintending control of the business of distillers and rectifiers is exercised by the government, as was held by Judge Blodgett in his recent decision. U. S. v. Mason [Case No. 15,735]. I think that it is not an exaggerated statement to say that the distiller and rectifier, when they enter upon the business, contract that they will submit to this governmental surveillance. The method in which the business must necessarily be done, places the government in the position of a party in interest, to the extent of securing revenue therefrom, and the distiller and rectifier consent to this participation in interest. Statutes of this character have existed almost from the foundation of the government. In 1791. which was not long subsequent to the adoption of the amendments to the constitution, congress passed an act which is the very parallel of the present act in many of its provisions, and which authorized inspections, searches and seizures, and required books to be kept by distillers, subject to government inspection. Append. vol. 2 Ann. Cong. 2383. In Re Platt [Case No. 11,212], Judge Blatchford in a very elaborate opinion holds that "the searches and seizures authorized by the 2d section of the act of March 2, 1867, are not repugnant to the fourth or fifth amendments to the constitution. A search for and seizure of goods subject to duty, is made part of a system for the recovery of duties, and is a necessary part of such a system; and the books and papers which relate to goods with respect to which frauds are alleged to have been committed. are properly included in such searches and seizures." In this opinion Judge Blatchford fully reviews the history of revenue legislation in this country since 1789, as bearing upon the question of searches and seizures. In Stockwell v. U. S. [Case No. 13,-466], Justice Clifford, at the circuit, sustained the power of seizure of books and papers, upon a review of the law, and even approved the

admission of such books and papers in evidence, in a proceeding to recover penalties and unpaid duties. It seems questionable whether section 860 of the Revised Statutes, before referred to, was brought to his attention on the point of the admissibility of the books and papers as evidence against the parties charged with violation of the statute. This case was taken to the supreme court of the United States (13 Wall. [80 U. S.] 531), but the question of the power of seizure was not there raised or passed upon, and on the question of that power alone, it must be regarded only as an authority of judges at the circuit. In Re Meador [Case No. 9,375], a summons was issued by a supervisor of internal revenue, under a section of the law authorizing such a proceeding, requiring the production of books and papers. Disobedience of the summons was attempted to be justified under the fourth and fifth amendments to the constitution, but the court sustained the writ. A similar proceeding was sustained by the district court for the Southern district of Mississippi in Stanwood v. Green [Id. 13,303].

Conceding that the power sought to be exercised here is equivalent to the power of seizure, and in the absence of decision by the supreme court, I am clear in the conviction that the statute in question is not obnoxious to constitutional objection. This is not an attempt to unreasonably search the private affairs of the citizen. The books and papers called for pertain to the business in which the government, as a supervising power, has an interest, and concerning the conduct of which, as affecting the public revenues, the government is prosecuting the pending proceedings. The cases are not like those condemned by the courts of England where general warrants empowered the officers to enter any private house, and intrude upon the privacy of any citizen and seize private papers or property for purposes of personal prosecution on any charge the crown might choose to make. The power here claimed is one incidental to collection of public revenue. The proceeding is against property which it is claimed is subject to forfeiture because of alleged delinquencies in the use of that property in a business regulated by law. To all the conditions and requirements of that law the claimants subjected themselves when they entered upon the business. It is, in my judgment, no infringement upon their personal rights to require that books and papers used and kept by them in their business as distillers and rectifiers, shall be produced for inspection by the attorneys for the government. And in so holding, I am not unmindful of considerations pressed by the learned counsel upon the argument. I agree with counsel that, as was declared by the supreme court in Bronson v. Kinzie, 1 How. [42 U. S.] 311, the constitution was not designed to protect a mere barren and abstract right, not affecting the business of life. It was designed for the protection of real and substantial rights; and when the legislative

authority infringes upon those rights and transcends its constitutional powers, the duty of the court, as the case may arise, is clear, and not to be avoided. But upon all the considerations stated, I do not hesitate to express my judgment that the law in question is constitutional and valid.

The act of 1874 provides that, upon motion, the court may, in its discretion, require books and papers to be produced; and it is insisted that this discretion should be exercised in favor of the claimants and the motions be denied. But, as I hold the law to be valid, and as no objection addressed to the discretion of the court has been urged, except that involved in the claim that the law is invalid, I do not think it would be a just and suitable exercise of discretion to refuse the orders applied for. A case is made, on the papers, for the granting of the orders. No special circumstances are shown for a refusal of the orders. The claimants stand on what they maintain are constitutional rights. Deciding as I do, that these rights are not infringed upon, on the cases presented, I must permit the orders requiring the production of the specified books and papers, to stand.

Nor do I think I should dismiss these proceedings or vacate the orders made, on the objection that the motion papers do not describe with sufficient particularity the books and papers required. They are specified in the motion as the day-books, blotters, journals, ledgers, cash books, letter books, shipping-bill books, and receipts for spirits and liquors shipped, and invoices of spirits and liquors bought or received, used and kept by the parties in their business as distillers or rectifiers, between certain dates named in the written motion. This is a sufficient designation of the books and papers to meet the requirement of the statute. The books and papers are specified, the business in which they were made, kept and used, is named and dates are given.

The motion to vacate the order heretofore granted in Schoenfield's Case is denied. All the orders for the production of books and papers in these cases will stand. The books and papers should be produced for examination by the government attorneys, the owners having the right to be present with their counsel during such examination.