**Robert SMITH et al., Petitioners,**

v.

**Edward FAIR, Respondent.**

**No. C 73–187.**

United States District Court,
N. D. Ohio, W. D.

Aug. 8, 1973.

Ted Iorio, Toledo, Ohio, for petitioners.

Lawrence Huffman, Gary R. Hermon, Lima, Ohio, for respondent.

OPINION and ORDER

WALINSKI, District Judge.

This cause came to be heard on a petition for habeas corpus filed pursuant to 28 U.S.C. § 2254.

Petitioners Smith and Hatfield are the manager and projectionist, respectively, of a theatre in Lima, Ohio, which

exhibits material of a sexually explicit nature. Smith was charged in an affidavit filed by Lawrence S. Huffman, Prosecuting Attorney of Allen County, Ohio, with exhibiting obscene material contrary to § 2905.35 of the Ohio Revised Code. That affidavit was filed May 8, 1973.

On that same date Gary R. Hermon, Assistant Prosecuting Attorney, filed a "motion for a prior adversary hearing" to determine the character of the films in question. A subpoena *duces tecum* was then issued commanding Smith and Hatfield to provide the films in question at that prior adversary hearing. Both petitioners appeared at the hearing, but refused to supply the films alleging that the subpoena constituted an unconstitutional abridgement of rights guaranteed to them under the Fifth and Fourteenth Amendments to the Constitution of the United States. Judge Robert M. Light then declared the petitioners to be in contempt, imposing a sentence of ten days or until they should purge themselves by complying with the subpoena *duces tecum*. It is from that detention that this petition is brought.

I. Privilege Against Self-Incrimination

Petitioners herein contend that a subpoena *duces tecum* requiring production, by the defendant, of evidence to be used in a criminal prosecution is proscribed by Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). Respondent contends that the material here sought is "non-testimonial" in nature and is therefore beyond the prohibition contained in the Fifth Amendment as interpreted by *Boyd. See, e. g.,* Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (blood tests); United Sates v. Jones, 443 F.2d 1077 (4th Cir. 1971) (voice prints); Chambers v. State, 46 Ala.App. 247, 240 So. 2d 370 (1970) (physical exhibitions); State v. Thomson, 256 La. 934, 240 So.2d 712 (1970) (handwriting exemplars).

A second somewhat non-legal argument is that the courts have required a prior adversary hearing before seizure of allegedly obscene material and prosecutors generally have been unable to find constitutionally permissible methods of conducting such a hearing. That argument merits no discussion beyond a suggestion that one cannot defend the deprivation of certain of the defendant's constitutional rights on the grounds that such deprivation was necessary in order to guarantee other, equally fundamental, rights. *See, e. g.,* United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L. Ed.2d 138 (1968); Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L. Ed.2d 1247 (1968). Stated simply, although the prosecutor's avowed intention to safeguard the plaintiff's First and Fourth Amendment rights is laudable, it cannot be accepted as justification for a circumvention of the Fifth Amendment.

The Fifth Amendment was never intended to advance the efficient securing of criminal convictions. It is unquestioned that an inquisitorial system of criminal justice would be preferable to the accusatorial system if percentage of convictions were the only gauge by which we judge societal interest. The framers of our constitution drew on a strong English heritage which abhorred the inquisitorial techniques as utilized by the Star Chamber. One of the earliest recorded defenses of that privilege was made by John Lambert in 1532. Tried as an obdurate heretic by the ecclesiastical courts of the canon law, Lambert refused to answer certain questions asserting, " * * * it is written in your own law, 'No man is bound to betray himself.'" Foxe J., The Acts and Monuments of John Foxe: A New and Complete Edition, ed. by Rev. Stephen Reed Cattley (London 1837–41 V. 1 p. 184.) Later in the same century a Puritan, John Udall, refused to affirm or deny his alleged complicity in a movement of reform of Anglican worship. When asked to take the oath *ex officio* he asserted, "To swear to accuse myself or others, I think you have no law for that." Another Puritan victim of the Anglican Inquisition of the Sixteenth

Century, Nicholas Fuller, took the issue to Parliament in 1593 claiming that a requirement of self-incrimination was "contrary to the English common law, against the law of nature, against justice and equity."

The first charter issued to an American colony—Virginia in 1606—provided that the colonists and their descendants were to "have and enjoy all liberties, franchises, and immunities * * * as if they had been abiding and born, within this our Realm of England * * *."

The right to be free from self-incrimination became more firmly entrenched in both England and the colonies. In 1735, when Benjamin Franklin's minister refused to supply copies of allegedly heretical sermons, his refusal was taken as an admission of guilt. Franklin rose to the defense, characterizing that stand as "contrary to the common rights of mankind, no man being obliged to furnish *matter of accusation* against himself." (Emphasis added.)

Although there is little to provide a historical prospective for the Bill of Rights, it might be well to examine the writings of Hamilton, one of its principal *detractors*. In his missive to the people of New York (The Federalist No. LXXXIV), he advanced the argument not that a specific bill of rights was unwise, but rather that it was superfluous. After citing the Magna Charta and the Petition of Right of Charles I as examples of stipulations between kings and their subjects and abridgements of prerogative in favor of privilege, reservations of rights not surrendered to the prince, Hamilton went on to say:

"It is evident, therefore, that, according to their primitive signification, they (Bill of Rights) have no application to constitutions professedly founded upon the power of the people, and executed by their immediate representatives and servants. Here, in strictness, the people surrender nothing; and as they retain everything they have no need of particular reservations. * * *

"I go further, and affirm that bills of rights, in the sense and to the extent in which they are contended for, are not only unnecessary in the proposed Constitution, but would even be dangerous. They would contain various exceptions to powers not granted; and, on this very account, would afford a colorable pretext to claim more than were granted. For why declare that things shall not be done which there is no power to do?"

Since the instant case is one brought on a petition for habeas corpus, it is interesting to note that it was precisely that vehicle that Hamilton proposed for the enforcement of such basic rights.

(Quoting Blackstone) " 'To bereave a man of life, or by violence to confiscate his estate, without accusation or trial, would be so gross and notorious an act of despotism, as must at once convey the alarm of tyranny throughout the whole nation; but confinement of the person, by secretly hurrying him to jail, where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore a MORE DANGEROUS ENGINE of arbitrary government.' And as a remedy for this fatal evil he is everywhere peculiarly emphatical in his incomiums on the habeas corpus act, which in one place he calls 'the BULWARK of the British Constitution.' "

 It is the opinion of this Court that the Fifth Amendment is clearly one of those sacred rights retained to the people, and any attempt to usurp that right must be viewed very strictly by the judiciary. *See e. g.*, Ullmann v. United States, 350 U.S. 422, 426–429, 76 S.Ct. 497, 500–502, 100 L.Ed. 511 (1956); Quinn v. United States, 349 U.S. 155, 161–162, 75 S.Ct. 668, 672–673, 99 L.Ed. 964 (1955); Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951).

The first time the Supreme Court had an opportunity to discuss the applicability of the Fifth Amendment to subpoenas

*duces tecum* was in Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L. Ed. 746 (1886). The statute at issue there required that in revenue cases, on motion of the government attorney, the defendant or claimant produce in court his private books, invoices or papers, or else the allegations of the government were to be taken as admitted. Even though the case at bar was technically in the nature of a civil action (forfeiture), the Court refused to allow an impingement upon the spirit of the Fifth Amendment saying:

" \* \* \* suits for penalties and forfeitures incurred by the commission of offenses against the law, are of this quasi-criminal nature, we think that they are within the reason of criminal proceedings for all the purposes of the Fourth Amendment of the Constitution, and of that portion of the Fifth Amendment which declares that no person shall be compelled in any criminal case to be a witness against himself; and we are further of (the) opinion that a compulsory production of the private books and papers of the owner of goods sought to be forfeited in such a suit is compelling him to be a witness against himself, within the meaning of the Fifth Amendment to the Constitution. \* \* \* " *Id.*, at 634–635, 6 S.Ct. at 534.

It was so universally recognized that the privilege was one of those basic unsurrendered rights, spoken of by Hamilton, that very few cases in the Nineteenth Century addressed the issue. *See* United States v. Three Tons of Coal, 6 Biss., 379, 28 Fed.Cas. No. 16,515, page 379 (1875). Typical language found in the early cases was that the clause was to have "a broad construction in favor of the right which it was intended to secure." Counselman v. Hitchcock, 142 U.S. 547, 562, 12 S.Ct. 195, 198, 35 L.Ed. 1110 (1892).

With the advent of the Twentieth Century, exploding population and rapid technological advances in the field of criminal justice administration made the identification of particular suspects a crucial factor. When called upon to decide a case in which the defendant argued that testimony as to his physical size was barred by the Fifth Amendment, Mr. Justice Holmes, speaking for the Court, revealed again his ability to pierce legal abstractions to expose their proper position in the framework of constitutional liberty:

"Another objection is based upon an extravagant extension of the 5th Amendment. A question arose as to whether a blouse belonged to the prisoner. A witness testified that the prisoner put it on and it fitted him. It is objected that he did this under the same duress that made his statements inadmissible, and it should be excluded for the same reasons. But the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, *not an exclusion of his body as evidence when it may be material.* The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof." (Emphasis added.) Holt v. United States, 218 U.S. 245, 252–253, 31 S.Ct. 2, 6, 54 L.Ed. 1021 (1910).

From that genesis arose an entire line of federal cases relating to the relationship of the Fifth Amendment protections to the pragmatic necessity of suspect identification. *See, e. g.,* Rigney v. Hendrick, 355 F.2d 710 (3d Cir. 1965); Copeland v. United States, 120 U.S.App. D.C. 5, 343 F.2d 287 (1964); Caldwell v. United States, 338 F.2d 385 (8th Cir. 1964) (police lineups); Higgins v. Wainwright, 424 F.2d 177 (5th Cir. 1970), cert. denied, 400 U.S. 905, 91 S. Ct. 145, 27 L.Ed.2d 142 (voice identification); Kennedy v. United States, 122 U.S.App.D.C. 291, 353 F.2d 462 (1965) (confrontation by the victim); Smith v. United States, 117 U.S.App.D.C. 1, 324 F.2d 879 (1963); United States v. Iacullo, 226 F.2d 788 (7th Cir. 1955) (fingerprints); Ringer v. United States, 463

F.2d 1083 (8th Cir. 1972); United States v. Doe, 457 F.2d 895 (2d Cir. 1972) (handwriting exemplars); United States v. Zammiello, 432 F.2d 72 (9th Cir. 1970); Peoples v. United States, 365 F.2d 284 (10th Cir. 1966) (physical characteristics generally). *See also,* generally, United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); United States v. Mara, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973).

After a holding that the Fourteenth Amendment absorbed the Fifth Amendment and made it applicable to the States, *see* Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *see also,* Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967); Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, rehearing denied, 381 U.S. 957, 85 S.Ct. 1797, 14 L. Ed.2d 730 (1965); Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), many of the same *identification* exceptions were recognized in state courts. *See, e. g.,* Heichelbech v. State, 281 N.E.2d 102 (Ind. 1972); Hollars v. State, 286 N.E.2d 166 (Ind.1972); Sandoval v. People, 172 Colo. 383, 473 P.2d 722 (1970); State v. Mordecai, 83 N.M. 208, 490 P.2d 466 (1971); McCray v. State, 85 Nev. 597, 460 P.2d 160 (1969); State v. Trotter, 4 Conn.Cir. 185, 230 A.2d 618 (1967). Each and every one of these cases go to establishing a single, simple fact which the defendant has no power to alter— his identity. To hold otherwise would lead to the logical absurdity that a defendant could not be required to attend his criminal trial where the state intended to utilize a complaining witness to identify him.

The one case in which the Supreme Court allowed the taking of a blood sample not for the purpose of identification, but to establish affirmative real evidence (*i. e.,* blood-alcohol levels) was Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). That case is clearly distinguishable from the one at bar in that:

"Not even a shadow of testimonial compulsion upon or enforced communication by the accused was involved either in the extraction or in the chemical analysis. * * * his participation, except as a donor, was irrelevant * * *." *Id.* at 765, 86 S. Ct. at 1832.

The Court quoted Miranda v. Arizona, 384 U.S. 436 at 460, 86 S.Ct. 1602, 16 L. Ed.2d 694:

" * * * the constitutional foundation underlying the privilege is the respect a government—state or federal—must accord to the dignity and integrity of its citizens. To maintain a 'fair state-individual balance,' to require the government to 'shoulder the entire load.'" *Schmerber, supra* at 762, 86 S.Ct. at 1831.

Here the effect of the subpoena *duces tecum* would be to force the defendant to go out and actively secure evidence, which may or may not be in his possession, and present it in a case against himself. If he is unable or unwilling to comply with the subpoena, he makes himself liable in criminal contempt. That result seems, to this Court, to violate the constitutional safeguards of the Fifth Amendment.

## II. Prior Adversary Hearing

This case arose prior to the decision of the Supreme Court in Heller v. New York, 413 U.S. 483, 93 S.Ct. 2789, 37 L. Ed.2d 745 (1973). Although there was a great deal of confusion in the Circuit Courts of Appeals regarding the necessity of conducting an adversary hearing on the question of obscenity before seizure of materials presumptively protected by the First Amendment, *Heller* apparently dismissed that contention. It was out of the conflict surrounding this area that the instant case arose. Although the prior adversary hearing is not constitutionally required, *cf.* Roaden v. Kentucky, 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973), the respondent herein should be commended for his attempt to traverse the morass and at

least partially satisfy the contentions of the dissenters in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). A procedure which would afford a judicial determination as to the character of the material in question, in advance of criminal prosecution, coupled with immunity for past acts, would certainly satisfy the following objections of Mr. Justice Douglas in *Miller*, 413 U.S. 15, at 37, 93 S.Ct. 2607, 2623, 37 L.Ed. 2d 419.

"* * * how under these vague tests can we sustain convictions for the sale of an article prior to the time when some court has declared it to be obscene?" *Id.* at 39, 93 S.Ct. at 2623.

"Under the present regime—whether the old standards or the new ones are used—the criminal law becomes a trap. A brand new test would put a publisher behind bars under a new law improvised by the courts after the publication. That was done in *Ginzburg* and has all the evils of an *ex post facto* law.

"My contention is that until a civil proceeding has placed a tract beyond the pale, no criminal prosecution should be sustained." *Id.* at 41, 93 S. Ct. at 2624.

Thus, the procedure outlined herein would certainly give notice to an exhibitor of the judicial response to his material and avoid the potential chilling effect on the exercise of First Amendment rights that criminal prosecution could have.

### III. Exhaustion of State Remedies Required by 28 U.S.C., § 2254

 The defendant contends that an attempt to exhaust state remedies would be futile under the current state of the law in Ohio, *see* State v. Albini, 31 Ohio St.2d 27, 285 N.E.2d 327 (1972); State v. Boyd, 35 Ohio App.2d 147, 300 N.E.2d 752 (Decided December 18, 1972), and it would therefore be a proper exercise of judicial discretion to entertain this action. *See, e. g.*, Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed. 2d 418 (1971):

"The exhaustion requirement is merely an accommodation of our federal system designed to give the State an initial 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Id.* at 250, 92 S.Ct. at 250.

A reading of the Ohio case law in this area places this case within that narrow class of action in which exhaustion will not be required.

### IV. Conclusion

It further appearing that, however commendable the intent of the respondent to guarantee First Amendment rights of the petitioner, such cannot justify an infringement of equally important Fifth Amendment guarantees. *Absent the granting of immunity for past acts*, the action of the State Court in this action constitutes an abridgement of the petitioners' constitutional rights, and it is

Ordered that the writ of habeas corpus prayed for herein should be and hereby is granted.