UNITED STATES of America,
Plaintiff-Appellee,

v.

John DOHM and Robert Rowen,
Defendants-Appellants.

No. 78–5030.

United States Court of Appeals,
Fifth Circuit.

June 21, 1979.

Jerome B. Ullman, Miami, Fla. (Court-appointed), for Rowen.

Donald L. Ferguson, Miami, Fla., for Dohm.

Jack V. Eskenazi, U. S. Atty., Hugh F. Culverhouse, Jr., Linda C. Hertz, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before GEWIN, COLEMAN, and GOLDBERG, Circuit Judges.

COLEMAN, Circuit Judge.

Appellants Robert Rowen and John Dohm, along with Brian Martin and Harold Kramer, were charged with conspiracy to sell one kilogram of cocaine and with possession of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 846 and 841(a)(1).[1]

The Court granted a directed verdict of acquittal for Harold Kramer on both counts. The jury was unable to reach a verdict on either count against Brian Martin.[2]

The jury found Rowen guilty of the conspiracy charge under Count I, but could not reach a verdict on the Count II possession charge. He was sentenced to eighteen months in prison to be followed by three years of special parole.

Dohm was found guilty on all counts. For the conspiracy he was sentenced to three years imprisonment and three years special parole. He was given the same sentence on the possession conviction, the sentences to be served concurrently.

For reversal, Rowen suggests six errors. Dohm points to four. Three errors are asserted in common. Dohm asserts a fourth error which involves evidence concerning himself only. Rowen's other three points are without merit, necessitating no discussion.

The main events which led to the arrests and convictions of these appellants took place on August 2 and 4, 1977. On August 2 Drug Enforcement Administration (DEA) undercover agents Jerry Castillo and Michael O'Connor met with appellant Robert

---

**1.** 21 U.S.C. § 846

Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

21 U.S.C. § 841(a)

Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

(2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

**2.** A second trial of Brian Martin ended with a similar result. Subsequently, the indictment against Martin was dismissed upon motion by the government.

Rowen and Brian Martin at a restaurant/lounge in Miami. The purpose of the meeting was to discuss arrangements for the purchase of cocaine by Castillo, who, of course, was acting in his undercover capacity.

On August 4 Castillo received a phone call from Martin at a special unlisted phone at the DEA Regional Offices in Miami. Martin said that everything had been arranged for the drug purchase. In a subsequent conversation, Martin instructed Castillo to drive to his (Martin's) apartment where they would then drive to the house of his "source of supply". Castillo and O'Connor then drove to Martin's' apartment. From there they followed Martin and Rowen to Dohm's home.

While O'Connor waited in the car across the street, Castillo went into Dohm's house with Martin and Rowen. In the kitchen he met Dohm, and he noticed a quantity of white powder on the top of the kitchen counter. Following a conversation pertaining to the weight and price of a kilogram of cocaine, Castillo and Dohm agreed to a purchase price of $41,200, and Castillo said he would have to get the money out of the car. There was some discussion about Castillo not leaving the house at that moment because suspicious vehicles had been seen outside the house. Castillo, however, told Dohm that he wanted to conclude the deal because he had to catch a plane. He was allowed to leave the house, escorted by Martin.

Once outside the house, Castillo gave the pre-arranged arrest signal to O'Connor and other surveilling agents, and Martin and Kramer were arrested. Castillo and other agents then re-entered the house, where they placed Dohm and Rowen under arrest and seized approximately one kilogram of cocaine.

### I. Failure to Suppress Evidence

Appellants Dohm and Rowen contend that the Court erred in denying the motion to suppress the evidence of the cocaine which was found in Dohm's kitchen after the warrantless entry into the home because it was seized in violation of the "knock and announce" requirements of 18 U.S.C. § 3109:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

Although the statute refers to the execution of search warrants, it has been expressly held that its requirements also apply to entries made without warrants. *Miller v. United States,* 357 U.S. 301, 309, 78 S.Ct. 1190, 1195, 2 L.Ed.2d 1332 (1958). The Supreme Court has applied the statute to any forced opening, including the opening of a locked door with a passkey or even the opening of a closed but unlocked door. *Sabbath v. United States,* 391 U.S. 585, 590, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968). In *Sabbath* the Court did, however, expressly point out that entries obtained by ruse have been viewed as involving no "breaking". 391 U.S. at 590 n. 7, 88 S.Ct. 1755, *citing, e. g., Smith v. United States,* 5 Cir. 1966, 357 F.2d 486, 488 n. 1; *see also, United States v. DeFeis,* 5 Cir. 1976, 530 F.2d 14, *cert. den.* 429 U.S. 830, 97 S.Ct. 92, 50 L.Ed.2d 95.

The Supreme Court has also stated that although a home is given broad protection under the Fourth Amendment,[3] "when . . . the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street." *Lewis v. United States,* 385 U.S. 206, 211, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1966). Additional-

---

3. In *United States v. Gaultney,* 5 Cir. 1978, 581 F.2d 1137, we noted the reluctance of the Supreme Court to specify the circumstances under which a police officer may enter the home of a suspect to arrest him without a warrant. We also commented that this reluctance highlights the problem of balancing the critical need in this country for suppression of the narcotics trade with the protection of a person's right to privacy in his home. 581 F.2d at 1146.

ly, the court noted that the government is entitled to employ agents in deceptive roles in the detection of many types of crime, such as illegal drug transactions. 385 U.S. at 209, 87 S.Ct. 424.

Appellants argue that Agent Castillo's ruse ended when he left the house after Dohm told him not to leave, and therefore, his re-entry without knocking and announcing was a "breaking into" prohibited by § 3109. Castillo testified, however, that he explained to Dohm that it was necessary to complete the transaction as soon as possible, and that he must go to his car to get the money. He even took Martin with him. His deception had not ended.

In denying the motion to suppress the evidence the District Court ruled that "[t]his was all part of a single integral transaction that was still in the process of being completed," and therefore, it was not improper for the agent to depend on his ruse as a narcotics purchaser to re-enter the building without the formality of knocking and announcing his official position. We agree.

It must also be noted, however, that even if Dohm and Rowen had begun to suspect Castillo and even if they saw the arrests of Martin and Kramer by the agents out in front of Dohm's house (there is no evidence on this point), thus ending the effectiveness of the ruse, there is still justification for Agent Castillo and the others to enter the house unannounced. In this situation one of the "exigent circumstances" exceptions to § 3109, *i. e.,* the reasonable belief of the officers that there will be an attempted escape or that the evidence will be destroyed, would apply. *Miller v. United States, supra,* 357 U.S. at 309, 78 S.Ct. 1190; *Sabbath v. United States, supra,* 391 U.S. at 591, 88 S.Ct. 1755; *Ker v. California,* 374 U.S. 23, 39–40, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

■ We hold, as in *United States v. Gardner,* 5 Cir. 1977, 553 F.2d 946, that when Agent Castillo gave the pre-arranged signal after he came out of the house, there was probable cause for arrest, and because he knew that Dohm and Rowen remained in the house with the cocaine which he had seen, immediate re-entry with minimum disturbance was "necessary to prevent disposal of the cocaine, a powder which can easily be flushed down a toilet," 553 F.2d at 948, and, also, to prevent the escape of Dohm and Rowen. Therefore, the agents' failure to "knock and announce" did not make their actions an illegal search and seizure which would require suppression of the cocaine as evidence.

## II. *Denial of Severance*

Martin claimed at trial that he had set up the cocaine transaction because he believed he was working as a government confidential informant. Dohm and Rowen argue that this entrapment defense was inconsistent with and prejudicial to their defense, mandating a severance or mistrial. They made motions for severance or mistrial after all the evidence was in and while jury instructions were being discussed. The judge denied the motions but offered to use a bifurcated procedure by which the jury would hear Dohm and Rowen's arguments and reach a verdict before hearing Martin's closing argument. Although appellants maintained their desire for a severance or mistrial, they agreed to the use of the procedure suggested by the Court.

Appellants now assert that the Court erred in refusing to grant their motion and that the bifurcated procedure did not cure the prejudicial effect of Martin's entrapment defense. We disagree.

Rule 14 of the Federal Rules of Criminal Procedure says that a trial court may grant a motion for severance when "a defendant or the government is prejudiced by a joinder of offenses or of defendants . . . for trial." [4] We have frequently empha-

---

4. Federal Rules of Criminal Procedure
Rule 14.
RELIEF FROM PREJUDICIAL
JOINDER

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial to-

sized that the disposition of a Rule 14 motion for severance rests within the sound discretion of the trial judge.[5]

Absent an abuse of discretion, the ruling of the trial judge will not be disturbed. *United States v. Crawford,* 5 Cir. 1978, 581 F.2d 489, 491; *United States v. Morrow,* 5 Cir. 1976, 537 F.2d 120, 134; *Tillman v. United States,* 5 Cir. 1969, 406 F.2d 930, 935. "The failure to grant a severance merely because one codefendant is relying on a defense of entrapment while another is not does not of itself constitute an abuse of discretion." *United States v. Eastwood,* 5 Cir. 1974, 489 F.2d 818, 822; *see also, Morrow, supra,* 537 F.2d at 138; *United States v. Russo,* 5 Cir. 1972, 455 F.2d 1225, 1227.

The burden is on the movant to convince the court that without a severance he or she will be unable to obtain a fair trial. A mere showing of some prejudice is usually insufficient; the movant must " 'demonstrate compelling prejudice against which the trial court [was] unable to afford protection.' " *Crawford, supra,* 581 F.2d at 491, quoting *United States v. Swanson,* 5 Cir. 1978, 572 F.2d 523, 528; *accord, Morrow, supra,* 537 F.2d at 136; *United States v. Perez,* 5 Cir. 1973, 489 F.2d 51, 65. The defendant must show more than the possibility that a separate trial would offer him a better chance of acquittal. *Tillman, supra,* 406 F.2d at 935.

Neither Dohm nor Rowen has made a showing of specific, compelling prejudice to their cases caused by Martin's defense of entrapment. Dohm insists that delay in Martin's assertion of the defense limited his intelligent exercise of important trial rights. We think that it was apparent from Martin's cross examination of the first witness to take the stand, Agent Castillo, that Martin was presenting an entrapment defense based on his relationship with Agent Castillo and a government informant. Bringing this information out at so early a point in the trial could hardly be considered as prejudicial delay.

Appellants argue that Martin's entrapment defense was so antagonistic to their positions that they did not get a fair trial, citing *United States v. Johnson,* 5 Cir. 1973, 478 F.2d 1129. The factual situation in that case is easily distinguishable from this case. In *Johnson* codefendant Smith had made a confession which directly implicated appellant Johnson and contradicted his defense that he was not present when the crime was committed. When Smith took the stand he further incriminated Johnson in his testimony. This Court held that Johnson should have been granted a severance because Smith turned out to be the government's best witness against Johnson. In the present case, however, Martin in his testimony made no attempt to implicate the appellants.

Moreover, Dohm's and Rowen's "defenses" were not inconsistent with that of Martin. Neither of the appellants asserted any defense. In a recent case, *United States v. Marable,* 5 Cir. 1978, 574 F.2d 224, we made the following statement:

> Before a severance will be granted due to inconsistent defenses, a defendant must demonstrate that the defenses are antagonistic to the point of being mutually exclusive. . . . As a defense, Marable denies any involvement in the heroin conspiracy. Horace Jones offered no defense. No conflict between the defenses is apparent.

574 F.2d at 231.

gether, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

**5.** *United States v. Mullens,* 5 Cir. 1978, 583 F.2d 134, 142; *United States v. Crawford,* 5 Cir. 1978, 581 F.2d 489, 491; *United States v. Swanson,* 5 Cir. 1978, 572 F.2d 523, 528; *United States v. Morrow,* 5 Cir. 1976, 537 F.2d 120, 134; *United States v. Eastwood,* 5 Cir. 1974, 489 F.2d 818, 821; *United States v. Perez,* 5 Cir. 1973, 489 F.2d 51, 65; *Tillman v. United States,* 5 Cir. 1969, 406 F.2d 930, 935.

Similarly, in this case since appellants offered no defense at trial, there was no conflict of defenses with Martin.

■ Additionally, we find that the trial judge did not act improperly in utilizing the bifurcated summation—jury deliberation procedure rather than granting the motion to sever. Judicial economy necessarily exerts strong pressure in favor of upholding a trial court's decision to conduct a joint trial, *Morrow, supra*, 537 F.2d at 136. In this case the trial court carefully considered "[t]he degree to which prejudice [could] be lessened by other remedial court action," *United States v. Garza*, 5 Cir. 1977, 563 F.2d 1164, 1166, and chose an appropriate and effective remedy.

### III. *The Judge's Statements*

Appellants claim that the trial court made several errors in ruling on a question asked (by Martin's attorney on cross examination) of confidential informant Gary Peacock, a government witness. The exchange is as follows:

Q. Where do you live?

MR. CULVERHOUSE: Objection. That's irrelevant.

THE COURT: Sustained.

MR. MARCUS: Judge, I think that a man—everybody who has testified here today has given his address and if he's a resident here and the means and mode of living, I think is pertinent to this case as to the method that he—and how he lives and what—

THE COURT: Fine.

Then you go ahead and tell me why you're objecting.

MR. CULVERHOUSE: Your Honor, I object on a couple of grounds; one, it's irrelevant; number two, the government agents never give their address.

THE COURT: I thought he was going to say he had concern about safety for this witness, that's why I sustained the objection.

MR. CULVERHOUSE: The reason is that he is a government agent.

THE COURT: But since we are both making speeches in front of the jury,

since both of you are, that's the reason the objection is sustained.

This man has testified in this case, and we all know there are other factors that have not been brought out before the jury.

The objection is sustained. He does not have to give his home address. [Transcript, pp. 325–326].

After these remarks were made, Martin's attorney asked a few more questions of Peacock and then requested a bench conference. The judge excused the jury, and Rowen's attorney moved for a mistrial, stating that "the colloquy between the court and counsel improperly suggest[ed] to the jury that Mr. Robert Rowen might be prone to use violence on this witness." [Transcript, p. 327]. A discussion of what had been said followed, and the judge offered to give an instruction to the jury that the question, objection, and ruling by the court should not be considered against any defendant but Martin. Dohm's attorney approved of such an instruction. Martin's attorney and Rowen's attorney objected to it. The judge so instructed the jury "over the objection of counsel for the defense" [Transcript, p. 334], and the cross examination of Peacock by Martin's attorney proceeded.

■ Dohm and Rowen argue that the judge's comments implied to the jury that perhaps one or more of the defendants were prone to use violence on the confidential informant and that additional evidence incriminating the defendants was being withheld from the jury. They say that by making these comments the judge "added to" the evidence in a way that was proscribed by the Supreme Court in *Quercia v. United States*, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933); *see also, United States v. Cisneros*, 5 Cir. 1974, 491 F.2d 1068; *Moody v. United States*, 5 Cir. 1967, 377 F.2d 175. Each of these cases is easily distinguishable from the present case in that the judges in those cases made direct, prejudicial comments in the course of instructing the jury, whereas in this case the judge's remarks

were basically directed toward counsel and were not specifically prejudicial to either of the appellants.

Additionally, there is no basis for asserting that the jury would infer from the judge's remarks that the appellants were prone to use violence against the witness. First, as noted by the Court, the exchange had nothing to do with Dohm and Rowen since the question was propounded by Martin's attorney. Second, the Court specifically instructed the jury that the comments were to be considered against Martin only and not against the other defendants. Third, any implication of threatened harm toward Peacock by any of the defendants was eliminated when Peacock subsequently testified that he had not been threatened by anyone. Thus, the remarks by the Court were not prejudicial to appellants.

Rowen also argues that Peacock should have been required to give his home address. We disagree under the circumstances, but do not find this matter properly before us on appeal because Rowen did not object to the court's ruling that Peacock did not have to divulge his address. Rule 50, Fed.R.Crim.P.[6]

We find the other two arguments raised by Rowen without merit.

### IV. *Admission of Testimony as to Dohm's Bond Hearing Statement*

Finally, Dohm complains of the admission of testimony by government agents as to statements he had made at his initial appearance (seeking bail) before U. S. Magistrate Peter R. Palermo on August 5, 1977. At that time the magistrate held a bond hearing for Dohm and for the other three defendants. Dohm claims that what he said under oath should not have been admitted against him because the statements were made when he was without assistance of counsel and because they were made in

an attempt to secure his Eighth Amendment right to reasonable bail.

At the trial on the merits Agent Castillo, over objection, was allowed to testify [irrelevancies omitted] as follows:

Q. And, before Judge Palermo asked these four defendants any questions, did he advise them of any of their constitutional rights?

A. Yes, he did, sir. He advised each individual of his constitutional rights.

Q. And, what rights would those be, sir?

A. That's their right to remain silent, right to obtain counsel, a lawyer, if they can't afford a lawyer would be appointed to them, and—

\*　　\*　　\*　　\*　　\*　　\*

Q. Recalling your attention to Mr. Dohm, do you recall Judge Palermo advising Mr. Dohm of his rights?

A. Yes, I do, sir.

Q. Do you recall Judge Palermo [telling him] that anything he said at the hearing could be used against him in later proceedings?

A. Yes, he did.

Q. And after the Judge admonished him as to these rights, did Mr. Dohm make any statements in your presence?

A. Yes, he did make a statement.

Q. Would you tell the Court and jury what those statements were?

A. *Mr. Dohm made a statement to the fact that it took him approximately two weeks to obtain the one kilogram [of cocaine] he handed me on that day in August.* [Italics ours].

The testimony of Agent O'Connor is (after the preliminaries) as follows:

Q. And after he was advised of these constitutional rights, did Mr. Dohm make any statements?

A. Yes, he did.

\*　　\*　　\*　　\*　　\*　　\*

---

6. *See United States v. Haynes*, 5 Cir. 1978, 573 F.2d 236, 241 n. 8:

"Moreover, a party cannot object on one ground in the trial court and then urge on appeal that the objection should [be] sustained on another ground. *See United States v. Hicks*, 524 F.2d 1001 (5 Cir. ·1975), cert.

denied, 425 U.S. 953, 96 S.Ct. 1729, 48 L.Ed.2d 197 (1976)."

In the present case, Rowen's objection at trial was that the colloquy between the court and counsel was improperly suggestive to the jury; Rowen did *not* object to the court's ruling that Peacock did not have to give his address.

A. Mr. Dohm stated to the Court that he did negotiate with Agent Castillo to sell him—

MR. BARABAN: Objection, Your Honor. That's not the statement that was made.

THE COURT: Well, you will be able to cross examine him. He is entitled to state what the statement was, and you can cross examine him on it. That's all I can do. I don't know what the statement was. Go ahead.

THE WITNESS: That Mr. Dohm had stated to the Court that he did negotiate with Agent Castillo to sell him approximately one to two kilograms of cocaine at a later date.

At this time, Magistrate Palermo suggested to Mr. Dohm that he not say anything until he had a lawyer present. But Mr. Dohm continued to talk and he did make a further statement that it took him nearly two weeks to collect the one kilogram that he did sell the agent. And that was the last statement that he had made.

In view of the prejudicial nature of this testimony, we ordered up a certified transcript of the tape recording of the hearing before the magistrate.

The transcript revealed that at this initial appearance, which is required by Rule 5 of the Federal Rules of Criminal Procedure,[7] Dohm and the other defendants were given a copy of the complaint against them. The magistrate then warned them that they had a right to remain silent and that any statement they made could be used against them in court. He told them that they had a right to an attorney and that the court could appoint an attorney for anyone who could not afford to hire one.[8] The magistrate asked each defendant individually if he had an attorney or needed to have one appointed. Dohm replied that he thought he had the money to hire an attorney, but he would have to find one. August 9 was announced as the deadline for the attorney to file an appearance.

The defendants were then sworn in. The magistrate explained that they were entitled to have a preliminary hearing at which the government would be called upon to make a probable cause showing and the defendants could also put on evidence, and that if probable cause were found, the matter would be bound over to the grand jury. Next the bond discussion began, it being specifically explained that this was *not* the preliminary hearing but that a bond hearing could be given at this time. The defendants were cautioned that they could wait until they had attorneys with them. Once again it was pointed out that anything the men said could be used against them later.

All the defendants went ahead. John Dohm's hearing was the last. After questioning him about his background, employment, and community ties, Mr. Palermo asked Agent O'Connor how Dohm had participated in the alleged crime. The following exchange took place:

THE COURT: Agent, what is his participation?

AGENT O'CONNOR: Mr. Dohm was the main source of the buy.

Mr. Rowen introduced Agent Castillo to him and during undercover negotiations Mr. Dohm stated to the agent that if this

---

7.                    Rule 5.

Initial Appearance Before
the Magistrate.

(a) In General. An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available federal magistrate or, in the event that a federal magistrate is not reasonably available, before a state or local judicial officer authorized by 18 U.S.C. § 3041. If a person arrested without a warrant is brought before a magistrate, a complaint shall be filed forthwith which shall comply with the requirements of Rule 4(a) with respect to the showing of probable cause. When a person, arrested with or without a warrant or given a summons, appears initially before the magistrate, the magistrate shall proceed in accordance with the applicable subdivisions of this rule.

8. Defendant Martin was the only one of the four who appeared with counsel at the initial appearance.

went through that he would be able to supply the agent approximately one to two kilos on a steady basis after this.

THE WITNESS: But, your Honor, sir, it wasn't true, but that's what I told them.

THE COURT: Who did he tell that to?

AGENT O'CONNOR: Agent Castillo.

THE COURT: Are you here?

AGENT O'CONNOR: Yes, sir.

AGENT CASTILLO: Yes, sir, I am.

THE COURT: Did he tell you that?

AGENT CASTILLO: Yes, sir.

I told him if he would be willing to supply on a steady basis that this was, you know, the first time and I was a good customer and I would come to him, you know, several times afterward, and if there would be any problems in supplying me with additional amounts, and he said it would be no problem.

THE WITNESS: It's—(inaudible).

THE COURT: Now, remember you don't have a lawyer with you now and this is just a bond hearing.

THE WITNESS: Yes.

THE COURT: You might hurt yourself to get involved too much, but if you know what you're doing, what you're saying, it's—(inaudible).

THE WITNESS: I would just say that it took me almost two weeks to get what I got, and I don't think I could get it again.

■ The Constitution does not require that an accused have an attorney with him at his initial appearance before a magistrate. Indeed, in many cases it is at this point that an accused is informed of his right to an attorney or to have an attorney appointed for him if he cannot afford one and the machinery is set in motion for the appointment of counsel.

■ As in this case, an accused person is entitled to be warned that any statements he makes can be used against him. If he is not so warned, under *Miranda*[9] any incriminating statements he makes may not be admitted at trial. The situation here, however, is that the appellant was given his rights and was warned at least thrice that his statements could hurt him.

The Supreme Court has pointed out on several occasions that the Fifth Amendment privilege against self incrimination does not preclude a competent witness from testifying voluntarily and of his own free will in matters which may incriminate anyone, including himself. *United States v. Washington,* 431 U.S. 181, 186–187, 97 S.Ct. 1814, 1818–1819, 52 L.Ed.2d 238 (1977) [testimony before a grand jury], *citing, United States v. Monia,* 317 U.S. 424, 427, 63 S.Ct. 409, 87 L.Ed. 376 (1943) and *United States v. Kimball,* 117 F. 156, 163 (CC SDNY, 1902); *accord, Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

The Supreme Court noted in *Washington, supra,* that "[i]ndeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable. . . . Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions."

■ We are entirely confident that the defendant was not coerced in his appearance before the magistrate. It is quite evident that he was anxious to get bail fixed in the hope that he could post it and thus obtain quick release from custody. The defendant had chosen not to wait until Wednesday to see if he could retain counsel. The magistrate had warned him not to make any statements which might harm him later. Nevertheless, Dohm chose to blurt out the statement which he now wishes he had never made.

We see no merit in Dohm's claim that he was compelled to speak in order to safeguard his Eighth Amendment right to reasonable bail. He wishes to analogize his situation to that of a defendant who wishes to contest the legality of a search and, to do so, may necessarily be required in his testi-

9. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

mony to give incriminating evidence against himself, *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). In *Simmons* the Supreme Court recognized that a defendant should not be forced to give up one Constitutional right in order to preserve another and held that incriminating testimony given on a motion to suppress on Fourth Amendment grounds is inadmissible at trial on the merits.

Here, we have a different matter. The Eighth Amendment right to bail, as implemented in Rule 46 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3146, is guaranteed. It was not necessary for the defendant to assert this right affirmatively or to offer testimony in support of the right. The sole issue was the amount of bail to be assessed, whether secured or unsecured. The magistrate was seeking information relevant to that issue.

When the officer testified that Dohm had said he could furnish more cocaine on a regular basis it must have occurred to Dohm that the magistrate was likely to be reluctant to fix bail at an amount which would release him to pursue the business. Consequently, he elected to make his unfortunate rebuttal.

It might be added, however, that the prosecutor, as a matter of sound trial strategy, would have been well advised to avoid this issue. Dohm had been caught red handed and what he said at some other time and place was hardly essential to a conviction.

The convictions of both appellants are AFFIRMED.

GOLDBERG, Circuit Judge, dissenting:

This case raises the profound question of whether, and to what extent, the government can compel a criminal defendant to sacrifice his Fifth Amendment right against self-incrimination in order to assert and enforce another constitutional right.

Buried deep in the majority's 10-page opinion are a few brief paragraphs which, with speed and apparent ease, reach a holding on this weighty constitutional question directly contrary to a long line of authority—not just elsewhere but in the Supreme Court and our own circuit—that could scarcely be clearer or more consistent. The majority today rules that the government can use in a criminal trial to prove the guilt of a defendant statements the defendant made in a pre-trial hearing on his Eighth Amendment right to nonexcessive bail. My disagreement with the majority is a pure legal dispute over the constitutionality of this ruling, for the facts in this case are undisputed. It is undisputed that the defendant made certain self-incriminating remarks [1] at a pre-trial hearing held solely to establish the bail in his case. It is also undisputed that Dohm made these remarks for the sole purpose of enforcing his right under the Eighth Amendment to be free of excessive bail. (Indeed, Dohm did not speak at all until the magistrate asked him: "Is there anything you would like to bring out that might help us in setting a reasonable bond?" Soon after the magistrate's question, and after the government put on testimony tending to support the setting of relatively high bail at the $25,000 amount recommended by the government, Dohm made his response. *See* p. 548 *infra.*) And it is undisputed that Dohm's testimony dealt with "what was 'believed' by the claimant to be a 'valid' constitution claim." *U. S. v. Kahan,* 415 U.S. 239, 243, 94 S.Ct. 1179, 1181, 39 L.Ed.2d 297 (1974).[2] Finally, it is undisputed that the government then introduced Dohm's self-incriminating statements in its case-in-chief in Dohm's criminal trial to establish Dohm's guilt.[3]

---

1. Dohm's statements are reprinted in their entirety and discussed at greater length at p. 548 *infra.*

2. Moreover, Dohm was forced to make this "Hobson's choice" between preserving his Fifth Amendment right to silence and enforcing his Eighth Amendment right to bail without benefit of counsel. *See* III *infra.*

3. The prejudice to Dohm's defense caused by the state's use at trial of his bond hearing statements can scarcely be overestimated. Moreover, exacerbating the problem was the fact that the state did not introduce a verbatim

## I.

In *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Supreme Court found "it intolerable that one constitutional right should have to be surrendered in order to assert another." The Court in *Simmons* thus held "that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt." *Id.* The Court made clear that its analysis was not peculiar or limited to a conflict between the Fifth and Fourth Amendments, but rather "applied to [any] situation in which the 'benefit' to be gained is that afforded by another provision of the Bill of Rights . . . ." *Id.*

Three years after *Simmons,* in *McGautha v. California,* 402 U.S. 183, 212, 91 S.Ct. 1454, 1469, 28 L.Ed.2d 711 (1971), the Court again made clear that "[t]he distinguishing feature in *Simmons'* case . . . was that 'the "benefit" to be gained is that afforded by another provision of the Bill of Rights.' " [4]

The full import of the *Simmons* decision—and its application throughout the Bill of Rights—has been recognized and developed in opinions in every circuit in this country, including our own. In *United States v. Harrison,* 461 F.2d 1127 (5th Cir. 1972), this court noted that the *Simmons* rule protects a defendant attempting to suppress an allegedly involuntary confession under the Fifth Amendment as fully as it applies in the Fourth Amendment context in *Simmons.* Similarly this court has

said the *Simmons* rule applies to the testimony of a defendant in a hearing to determine his competency to stand trial. *Pedrero v. Wainwright,* 590 F.2d 1383, 1388 n.3 (5th Cir. 1979) ("Had [the defendant] testified at the arraignment in support of his insanity defense or his incompetency claim, that testimony could not have been admitted at trial over his objection. *Simmons v. United States,* 1968, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247."). Finally in *Davis v. Wainwright,* 469 F.2d 1405 (5th Cir. 1972) we affirmed without an opinion the opinion of the district court, 342 F.Supp. 39 (M.D. Fla.1971), which said that under *Simmons* the government could not use against a defendant to prove his guilt testimony a defendant gives in support of his right under the Florida state constitution to have the costs of his defense paid by the government because of his indigency.

In fact, until the majority's opinion today, no court in this country has ever held that the *Simmons* rule does not apply to one of the Amendments in the Bill of Rights. On the contrary, "one may validly conclude that the lower courts have accepted and applied *Simmons* enthusiastically in the context of pre-trial hearings." Note, Resolving Tensions Between Constitutional Rights: Use Immunity in Concurrent or Related Proceedings, 76 Col.L.Rev. 674, 696 [hereinafter "Columbia Note"] (surveys the cases). Simply, the other federal courts have, like our own until this case, recognized fully that the Supreme Court in *Simmons* meant what it said, and have applied the rule accordingly throughout the Bill of

account of Dohm's statement, but instead had a government agent give an extremely distorted and even more incriminating version of the statement. Specifically, government agent O'Connor testified as follows: "That Mr. Dohm had stated to the Court that he did negotiate with Agent Costillo to sell him approximately 1 to 2 kilograms of cocaine at a later date.

"At this time, Magistrate Palermo suggested to Mr. Dohm not to say anything until he had a lawyer present.

"But Mr. Dohm continued to talk and he did make a further statement that it took him nearly two weeks to collect the one kilogram that he did sell to the agent. And that was the last statement that he had made."

Of course the transcript of the bail hearing reveals that Dohm actually made only one statement—"I would just say that it took me almost two weeks to get him what I got and I don't think I could get it again."—which while certainly prejudicial to his defense, was far less damaging on the state of mind issue which was so central to Dohm's defense.

4. Significantly this passage explaining *Simmons* was written for the majority of the Court in *McGautha v. California* by Justice Harlan, who also wrote the majority opinion in *Simmons.*

Rights. Thus, the government may not use in its case-in-chief to prove the guilt of a defendant any testimony which the defendant made previously to enforce his right to appointed counsel under the Sixth Amendment, *U. S. v. Anderson,* 567 F.2d 839 (8th Cir. 1977), *U. S. v. Ellsworth,* 547 F.2d 1096 (9th Cir.), cert. denied, 431 U.S. 931, 97 S.Ct. 2636, 53 L.Ed.2d 247 (1977), *U. S. v. Branker,* 418 F.2d 378 (2d Cir. 1968), and *see* also *Davis, supra,*[5] his right under the Fifth and Fourteenth Amendments to be free from double jeopardy, *U. S. v. Inmon,* 568 F.2d 326 (3rd Cir. 1977), see also *U. S. v. Cyphers,* 553 F.2d 1064 (7th Cir. 1977), his right to due process in a parole revocation proceeding, *Melson v. Sard,* 131 U.S.App.D.C. 102, 402 F.2d 653 (1968), but see *Flint v. Mullen,* 499 F.2d 100 (1st Cir. 1974), his right to protected speech under the First Amendment, *U. S. v. Sherpix,* 168 U.S.App.D.C. 121, 512 F.2d 1361 (1975) and *Smith v. Fair,* 363 F.Supp. 1021 (N.D.Ohio 1973), his right under the due process clause to be tried only if competent, *Gibson v. Zahradnick,* 581 F.2d 75 (4th Cir. 1978), *Collins v. Auger,* 577 F.2d 1107 (8th 1978), and *Pedrero, supra,* and his right under the Fifth and Fourteenth Amendments to not be convicted on the basis of an involuntary confession, *Harrison, supra,* and *Bailey v. U. S.,* 128 U.S. App.D.C. 354, 389 F.2d 305 (1967), see also *Doe v. Boyle,* 494 F.2d 1279, 1280 (4th Cir. 1974) (suggesting that all the judicial papers and proceedings in an action "initiated to protect a constitutionally guaranteed right against self-incrimination  .  .  . could be considered 'compelled testimony' to the extent that the Government seeks to introduce them in a subsequent criminal prosecution," and citing *Simmons* as a "similar approach").

Moreover, the Supreme Court has held unconstitutional various penalties which attached to the valid exercise of the privilege against self-incrimination, even where another amendment in the Bill of Rights was not at stake. *Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973) (disqualification from public bidding), *Spevack v. Klein,* 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967) (disbarment) and *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) (dismissal from job).[6]

The sole point of disagreement between the majority and myself is whether the instant case is distinguishable from *Simmons* and the vast body of law that preceded and has followed from it. The majority concedes that *Simmons* stands for the broad proposition that "a defendant should not be forced to give up one Constitutional right in order to preserve another." (Majority at p. 544.) Any other position would hardly be tenable given the *Simmons* Court's explicit reference to the entire Bill of Rights, of which the Eighth Amendment is a charter member. However the majority then makes an attempt to distinguish *Simmons* and the vast body of law it represents in two brief and conclusory sentences. The majority argues that the instant case is not controlled or influenced by the rule or analysis in *Simmons* because the instant case involves "the Eighth Amendment right to bail  .  .  . [which] is guaranteed." The majority argues additionally that in the instant case "It was not necessary for the defendant to assert this right affirmatively or to offer testimony in support of the right." The majority cites not a single case in support of this peculiar reading of *Simmons*—and accurately so, as there are no such cases—nor does it mention, much less

**5.** In *U. S. v. Kahan,* 415 U.S. 239, 94 S.Ct. 1179, 1181, 39 L.Ed.2d 297 (1974), the Supreme Court held that *Simmons* did not stretch so far as to protect the statements of a defendant in a Sixth Amendment right to counsel indigency hearing when the defendant did not have a good faith belief that he was indigent and when the statements were not being used to prove their incriminating content.

**6.** The Court in *Garrity* wrote that the procedures which threatened police officers with discharge if they refused to answer questions at an investigatory hearing imposed a " 'choice between the rock and the whirlpool' which made the statements products of coercion in violation of the Fourteenth Amendment." *Garrity, supra,* 385 U.S. at 496, 87 S.Ct. at 618, *quoting from Frost Trucking Co. v. Railroad Comm'n,* 271 U.S. 583, 593, 46 S.Ct. 605, 70 L.Ed. 1101 (1926).

attempt to distinguish, the many cases in our own circuit and in others which would seem to foreclose the majority's view, such as it is.

Before trying to interpret the majority's cryptic phrases, I would note that, whatever the phrases assert about the Eighth Amendment, I doubt they assert something which was not also true of the Amendment in 1968, when the Supreme Court wrote the rule in *Simmons* and indicated that the scope of the rule was at least as broad as the Bill of Rights. Nowhere in *Simmons* did the Supreme Court speak of protecting only those original amendments which are "unguaranteed," perhaps because such a rule would be as impossible as it sounds. By saying that the Eighth Amendment is distinguishable from the rest of the Bill of Rights because it alone guarantees a citizen a right, does the majority mean to imply that the Sixth Amendment right to counsel, the Fourth Amendment right to be secure in person and home, and the First Amendment right to the freedom of speech are somehow not guaranteed rights? Are they, perhaps, just recommendations or commendable goals?

Moreover, we note that not a single court or scholar has spoken in support of the peculiar position adopted by the majority in this case. As one law review commented:

> Certainly, however, there is no logical way to distinguish, without more, tensions between the fourth and fifth amendments from those between other constitutional rights. And again, the *Simmons* opinion does not appear to be limited to the deterrence of unlawful searches and seizures. Its emphasis was clearly on the coercive effect of requiring the surrender of one right in order to exercise another. The language and tone of the decision were quite broad and favor a more general reading. Indeed, the lower courts have applied *Simmons* in this more general sense and have not limited the case to the fourth amendment context . . .. Columbia Note, p. 4 *supra*, at 685.

While I am loathe to lend any credibility whatsoever to this exercise in "Rating the Amendments" by entering the fray on this crude and unfounded level, I must admit that, if anything, I find the testimony of a defendant in an Eighth Amendment hearing to be an *a fortiori* candidate for *Simmons* rule protection. In general, the testimony of a criminal defendant will be far more integral to the adjudication of his Eighth Amendment right to reasonable bail than it is to the determination of a Fourth Amendment claim. The primary, if not sole function of bail, after all, is to assure the presence of an accused at his trial. On the other hand, the Fourth Amendment, and the exclusionary rule in particular, are directed more at regulating the behavior of government agents. In many cases a Fourth Amendment adjudication could turn almost entirely on the testimony of third-person witnesses, such as those who conducted or observed the search; an Eighth Amendment claim, on the other hand, would often be all but controlled by a defendant's own testimony about his finances, his ties to the community, and his intention to appear for trial. As the majority noted, the Eighth Amendment is primarily implemented in Rule 46 of the Federal Rules of Criminal Procedure and in 18 U.S.C. § 3146. In § 3146 Congress explicitly provided that the judicial officer, "[i]n determining which conditions of release will reasonably assure appearance," shall "take into account," among other things, the accused's "character and mental condition." The Supreme Court has even written that "[t]he right to release before trial is conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty . . ." *Stack v. Boyle*, 342 U.S. 1, 4, 72 S.Ct. 1, 3, 96 L.Ed. 3 (1951). In sum, as a general rule the free and unfettered testimony of a criminal defendant will usually be far more valuable, if not literally indispensable, to a court in the fair, accurate and constitutional assessment of bail than the defendant's testimony in a court's consideration of other Bill of Rights disputes. If a court is to discharge its delicate and difficult constitutional duty of

548

determining sufficient but not excessive bail in the complex case of a particular defendant, it must not be compelled to make its determination largely uninformed of the most relevant facts and inevitably misled by a one-sided presentation of the evidence. The Eighth Amendment would be little better than a hollow mockery, and in no sense of the word guaranteed, if it did not include the right to the enforcement of the Amendment by an informed judge.

The instant case dramatically demonstrates the court's special need for the defendant's testimony in an Eighth Amendment adjudication. At the start of Dohm's bail hearing the magistrate asked Dohm: "Is there anything you would like to bring out that might help us in setting a reasonable bond?" Dohm responded: "Just that living and working here all my life and I'm not going anywhere." A government agent then testified that Dohm had told another government agent that "if this [drug deal] went through . . . he would be able to supply the agent . . . on a steady basis after this." The other agent then testified that Dohm had made this statement to him. When Dohm finally spoke out, it was to rebut the testimony of these two witnesses and to clarify his own out-of-court statements, which were being offered by the government to prove the truth of the matter asserted. It was apparently Dohm's contention that, in order to make a single sale of drugs, he attempted to give a false impression to a prospective customer that he was a big-time and well-established dealer. Confronted with this earlier street bluff as hearsay offered at his bail hearing to prove that he was in fact a regular dealer, Dohm's rebuttal was, in a practical sense, absolutely necessary to the protection of his right to be free of excessive bail. As the majority itself writes:

When the officer testified that Dohm had said he could furnish more cocaine on a regular basis it must have occurred to Dohm that the magistrate was likely to be reluctant to fix bail at an amount which would release him to pursue the business. Consequently, he elected to make his unfortunate rebuttal.

Majority opinion, page 544.

It was in this context that Dohm testified:

But, your Honor, sir, it wasn't true, but that's what I told them . . ..

I would just say that it took me almost two weeks to get him what I got and I don't think I could get it again.

A very real burden to speak and to explain is placed on a defendant when a police officer testifies to the defendant's incriminating out-of-court statements. If, as in this case, a defendant has testimony which he thinks rebuts a presumption created by his own hearsay statements introduced by a government witness, and if it is highly likely that the opposing testimony, if unrebutted, would be crucial, and probably determinative, in the court's assessment of bail, then the majority can not in any sense be right in saying that "[i]t was not necessary . . . to offer testimony in support of the right." In fact, in a realistic sense the instant defendant's need to rebut what he thought was a false presumption created by government witnesses and to overcome the burden shifted onto him by the government's account of his own hearsay statements is perhaps even more intense and compelling than the need of a defendant to introduce his own testimony to show that an illegal search has been conducted. Indeed, given the facts in this case, I can barely imagine a situation in which there would be *more* compelling need for a defendant to testify on his own behalf, unless perhaps it were a crime to be a deaf-mute and the defendant were on trial for it.[7]

7. Moreover, the danger of the majority's ruling in this case is obvious—it allows the government to heap accusation upon accusation against a defendant in a basically ex parte bail hearing, ensuring that it will be awarded for its excesses in one of two ways. Either it will make likely the setting of a very high bail against the defendant, which, by keeping him in jail, will handicap or even cripple his defense efforts, or else it will coerce the defendant into waiving his Fifth Amendment right of silence and handing the government choice pieces of evidence for its prosecution.

Moreover, a magistrate in a bail hearing must make an extremely difficult, almost Solomonic type of decision. I do not see how he can conscientiously discharge his difficult constitutional duty if a rule of law systematically deprives him of the best, and perhaps all the evidence on the accused's side of the case. To argue in this case that Dohm's testimony was unnecessary is especially suspect given the fact that, after hearing Dohm's side of the story, the magistrate set Dohm's bail at $15,000 below the initial amount recommended by the government. In doing so the magistrate explicitly referred to the matter about which Dohm made his incriminating remarks. (Upon setting Dohm's bond at $10,000, the magistrate said, "That's low under the circumstances, except when you do have heavy clients here and there.") Obviously this magistrate in particular, and any judge in the same position, would set a level of bail roughly correlated with such factors as whether or not he thought the defendant was an established and hard-core dealer. Of course, bail which is reasonable for a regular and established dealer is very likely to be excessive for a big-talking small fish trying, apparently with great difficulty, to obtain drugs on one occasion and make, with great pretense and bluff, a single sale. It is not within this court's power, duty or ability to assess at this point the credibility, or even the significance, of Dohm's testimony. My point is simply that both as a general rule and in this case in particular the defendant's own potentially self-incriminating testimony is indispensible to a magistrate's assessment of reasonable and constitutional bail.

Ironically, a close reading of *Simmons* itself, the only case cited by the majority on this question, actually reveals several other ways in which the Eighth Amendment raises an *a fortiori* case for *Simmons* rule protection. The *Simmons* court said the rule became necessary when two provisions of the Bill of Rights came into conflict, thus pressuring a defendant to sacrifice one to enforce the other. However the right which conflicted with the Fifth Amendment privilege in *Simmons*—to have illegally seized evidence excluded from the trial—does not appear on the face of the Fourth Amendment. The exclusionary rule "is not a personal constitutional right. It is not calculated to redress the injury to the privacy of the victim of the search or seizure . . . . Instead, 'the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect . . . .' *United States v. Calandra*, 414 U.S. [338,] 348, 94 S.Ct. 613, 38 L.Ed.2d 561." *Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976). The right to be free of excessive bail, on the other hand, appears explicitly in the Bill of Rights. It is a pure substantive constitutional right, unlike the more adjectival right of the exclusionary rule. More importantly, a citizen's right under the Eighth Amendment to be free from excessive bail is integral to, and in one sense underlies, the entire structure of constitutional rights in the Bill of Rights designed to ensure fair, accurate and humane treatment of an accused. As the Supreme Court stated in *Stack v. Boyle*, 342 U.S. 1, 4, 72 S.Ct. 1, 3, 96 L.Ed. 3 (1951), "This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. See *Hudson v. Parker*, 1895, 156 U.S. 277, 285, 15 S.Ct. 450, 453, 39 L.Ed. 424. Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning." Thus, without a full and unencumbered opportunity to assert and enforce a right to reasonable bail, a defendant is severely handicapped in his attempt to enforce any other of the constitutional protections guaranteed in the Bill of Rights.

> "[T]he spirit of the [bail] procedure is to enable [defendants] to stay out of jail until a trial has found them guilty. Without this conditional privilege, even those wrongly accused are punished by a period of imprisonment while awaiting trial and are handicapped in consulting counsel, searching for evidence and witnesses, and preparing a defense."

*Stack v. Boyle,* supra, 342 U.S. 1, 8, 72 S.Ct. 1, 5, 96 L.Ed. 3 (Jackson, J., concurring, joined by Frankfurter, J.).

Without one sentence of explanation or even so much as a nod of recognition to the cases in this circuit and elsewhere with contrary holdings, the majority in this case has carved out a huge and gaping exception to the Fifth Amendment law that has evolved under *Simmons.* Even more dangerously, the majority has chosen the very foundation of the criminal defense for the site of its excavation.

Given, then, that the Eighth Amendment seems to warrant application of the *Simmons* rule a fortiori, what possible basis did the majority have for denying this defendant *Simmons* protection altogether? While our task of interpreting the majority's analysis of *Simmons* is made especially difficult by its failure to cite any case supporting its view or to distinguish the cases which would seem to foreclose it, I think it is possible to hypothesize some of the arguments which might underlie the majority's unprecedented position. First, in describing the Eighth Amendment as "guaranteed" and in saying that "[i]t was not necessary for the defendant to assert this right affirmatively," the majority may have been referring to the fact that a court will attempt to enforce the Eighth Amendment in a bail proceeding *sua sponte.* In contrast, a court will apply the safeguards of the Fourth Amendment in a criminal proceeding only on the motion or objection of the defendant. Thus, one might say that something like a burden of production rests with the defendant in the prosecution of his Fourth Amendment claims, but not his Eighth.[8] While this is a distinction of sorts between the Fourth and Eighth Amendments, it hardly justifies giving the latter junior status in the Bill of Rights. Moreover, in terms of the *Simmons* rule itself, the burden of production argument collapses even before leaving the starting block. The simple fact is that the *Simmons* rule is not limited to just that testimony which a defendant is compelled to give in order to raise a Fourth Amendment claim before a court. Thus, for example, the *Simmons* rule does not apply only to that testimony given by a defendant to establish the standing to raise the Fourth Amendment claim. On the contrary, as the majority itself asserts, the rule in *Simmons* requires that *all* "incriminating testimony given on a motion to suppress on Fourth Amendment grounds is inadmissible at trial on the merits." Majority at p. 544. Moreover this circuit has explicitly said that the *Simmons* rule applies beyond the limited threshold area of the raising of a Fourth Amendment claim. In *U. S. v. Harrison, supra,* we wrote that the *Simmons* rule would bar the government from using at trial any testimony a defendant gave at a previous suppression hearing, including his testimony on the substantive question of whether his confession was voluntary. *See also U. S. v. Mullens,* 536 F.2d 997 (2d Cir. 1976) (in confession suppression hearing, defendant's testimony rebutting police testimony about the voluntariness of defendant's confession could not "later be used against [defendant] at trial"; citing *Simmons* ).

The majority does not, and can not, explain how the testimony which the defendant gives on the substantive merits of his Fourth Amendment claim, all of which is clearly protected by *Simmons,* as the majority itself concedes, can be distinguished from testimony given by a defendant to enforce his Eighth Amendment right to reasonable bail. Both types of testimony are simply part of the defendant's efforts to supply the court with the facts it needs to determine and enforce the defendant's rights under the constitution. Since a defendant's testimony offered to establish the unreasonableness of a search can not be used to prove his guilt, I can not conceive how the same defendant's testimony about the unreasonableness of an amount of bail

---

8. Of course in one important sense the Fourth Amendment places the initial burdens of production and proof on the government, in that the Amendment requires the government to apply for a search warrant and to convince a neutral magistrate that probable cause exists before conducting the search.

is logically, legally, or constitutionally distinguishable. The fact that a defendant must raise a Fourth Amendment claim to have it enforced, which the majority seems to offer as a distinction, becomes irrelevant once the claim is validly raised and before the court.

Moreover, a defendant of course has the right to remain silent during a bail hearing and then file a motion to have the bail reduced on the grounds that it was unlawfully fixed. In fact in *Stack v. Boyle*, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951), one of the leading Supreme Court cases on excessive bail, the accused not only filed such a motion, but also attacked the bail in a petition for habeas corpus. (It was the appeal of the habeas action which reached the Court.) In a motion to reduce bail, and in the habeas petition, the accused has burdens of production and proof at least as onerous as the burdens in the Fourth Amendment suppression hearing. Or, to use the majority's language, on a motion to reduce bail or in a habeas petition it *would* be "necessary for the defendant to assert the right affirmatively or to offer testimony in support of the right" to have it enforced at that point. Applying the majority's logic, then, it would appear that *Simmons* would protect the testimony the defendant gave in support of his Eighth Amendment motion or petition. And yet what sense does it then make to deny the *Simmons* protection to the initial bail hearing? Such a double-standard can accomplish only one of two things. First, it may compel the uncounseled and unwary, such as the instant defendant, into waiving rights they would not be compelled to waive in later proceedings. Second, it may cause informed defendants to remain silent in a bail hearing, saving their testimony for the motion to reduce when *Simmons* protection attaches. I see no sense in the majority's guaranteed test if its primary result will be the needless bifurcation of bail proceedings.[9]

In any event, Dohm's statements in this case were made in connection with an effort to reduce his bail from the level at which it seemed to have been tentatively set, and which Dohm thought was excessively high. This is arguably the functional equivalent of a motion to reduce excessive bail, or to suppress illegal evidence. At the start of the bail hearings, the following statements were made by the court:

THE COURT: Now, we'll go into the bond matter now. It's not your preliminary hearing.

The recommended bond as to each of the—

. . . . .

UNIDENTIFIED COUNSEL: Judge, I believe it's set now at $35,000 surety.

THE COURT: Wait a minute. I have it here.

Mr. Martin, 25,000.

Rowen, 25.

Kramer, 10; and Dohn, 25.

I don't see any change anywhere.

In other words, Dohm heard, at the start of his bond hearing, that his bond was "set now" at $25,000. It is likely that Dohm, being unrepresented by counsel and in court apparently for the first time in his life, thought that the $25,000 figure quoted by the magistrate and described as "set now" carried at least some presumptive authority.

**9.** The majority's apparent focus on whether there are burdens of proof and production on a defendant testifying in support of his Eighth Amendment rights could also lead to the astounding result of affording *Simmons* protection to a defendant only after he has been convicted. Under Rule 46(c), Fed.R.Crim.Proc., "[t]he burden of establishing that the defendant will not flee or pose a danger to any other person or to the community rests with the defendant." In spite of this burden, of course, a defendant still has an Eighth Amendment right to be free of excessive bail. *Bennett v. U. S.*, 36 F.2d 475 (5th Cir. 1929). Thus, under the majority's analysis in the instant case, a defendant would have *Simmons* protection for his testimony offered in support of post-conviction bail—because he must at that point "offer testimony in support of the right" to have it enforced—but would not have *Simmons* protection for his testimony offered for pre-conviction release. It is rather an unusual constitutional doctrine which gives more support to a defendant's efforts to get out of jail after he is convicted than before.

The magistrate, while describing the bond as "recommended," did not explain who had recommended the bond, did not explain whether it carried any presumptive force, and did not say whether or not either side had any burdens of proof or production. In other words, in this case in particular but also, to an extent, in any case in which the government recommends an amount for bond, the accused is placed in a position almost identical to that of a defendant seeking to oppose the introduction of tainted evidence in *Simmons*. In both cases the government in essence proposes something to the court—either the use of certain evidence or the setting of a certain bond—which the defendant feels is unreasonable. To prevent the government from getting its way, and to protect a threatened constitutional right, the defendant feels it is incumbent on him to rebut the government's evidence and to present his side of the case. While the parallels between *Simmons* and Eighth Amendment cases are clear under any circumstances, they are especially compelling in a case such as this where the entire hearing seems largely an investigation into whether an amount of bond described as "set now" and "recommended" is in fact excessive or unreasonable.

Other possible explanations of the majority's cryptic position might be gleaned from its statement that *Simmons* does not apply to Dohm's statements because "it was not necessary for the defendant . . . to offer testimony in support of the right." The majority does not say what "necessary" means in this context. Of course it can not mean that a reviewing court, with the benefit of hindsight, should decide whether Dohm would have gotten his bail reduced to $10,000 without testifying. Would the majority have a court study each and every utterance of a defendant in his pre-trial testimony to determine whether or not that utterance was "necessary" for the determination of the constitutional claim? Would the majority have a court deny *Simmons*

protection to any testimony which was helpful but not dispositive? Would a court be justified in denying *Simmons* protection to a defendant's good faith testimony offered in support of his rights simply because the court eventually happened to rely on other evidence in finding a constitutional violation? Moreover, how is a court to gauge which evidence influenced a prior court and how? Must it review all the evidence considered at the prior proceeding in order to assess the value of each sentence in the defendant's testimony? In addition, since *Simmons* applies to testimony given by a defendant in a losing cause, *Brown v. U. S.*, 411 U.S. 223, 93 S.Ct. 1565, 1569, 36 L.Ed.2d 208 (1973), in what possible sense could it be said that the ineffectual testimony was "necessary"? And finally, even if it were possible to concoct and apply some sort of "necessary testimony" test in *Simmons*, would not such a strange rule chill the defendant's prosecution of his Constitutional claims as fully as would having no rule at all, thus defeating the purposes of *Simmons*? Certainly a defendant in constant fear that anything he says may be considered "unnecessary" to the vindication of some esoteric and evolving constitutional doctrine by some future court, will most likely keep quiet rather than risk the awesome consequences of being convicted in his imminent trial.[10]

In *Harrison, supra,* this court said the *Simmons* rule protected the defendant's testimony in a pre-trial confession suppression hearing concerning, among other things, alleged threats by interrogating agents about the prosecution of the defendant's ill sister. In *Harrison* we did not stop to ask whether this particular testimony about Harrison's sister was *necessary* to the defendant's prosecution of his Fifth Amendment claim. Indeed, considering the purposes of the *Simmons* rule, the question is meaningless. Instead, the *Simmons* rule should, and does, protect all statements made by a defendant

---

**10.** Adopting some sort of "necessary testimony" test in this context would make as much sense as saying that the attorney-client privilege will henceforth protect only the communi-

cations which prove "necessary" to the client's case, or that use immunity will henceforth protect only the statements which prove "necessary" to a prosecution or investigation.

which he reasonably and in good faith believes will influence a court to protect his constitutional right to the benefits guaranteed him in the Bill of Rights. A stricter test would defeat the purpose of the *Simmons* rule, which is to allow citizens to enforce their constitutional rights. As for the instant case, no one, and most especially not the majority,[11] has argued that Dohm did not speak in a good faith effort to influence the magistrate to set a bail which Dohm thought was not excessive.

It is also possible that the majority, in saying it was unnecessary for the defendant to offer testimony in his hearing, may have been making an oblique reference to the fact there is no technical burden of proof on the defendant (or, of course, on the government) in a bail hearing. But of course, the *Simmons* rule has been applied in other situations in which the defendant also did not have a burden of proof, e. g. *Scott v. U. S.*, 136 U.S.App.D.C. 377, 419 F.2d 264 (1969) (defendant's statement during his pre-sentencing allocution inadmissible in later proceedings), and even in which the burden of proof rested on the government. For example, in *U. S. v. Sherpix, supra*, and *Smith v. Fair, supra*, courts held that the *Simmons* rule protected the statements a citizen made in an earlier hearing held to determine the obscenity of seized property. The burden of persuasion in such a hearing, of course, rests on the government, *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).[12]

The Supreme Court explicitly said in *Simmons*, and in *McGautha* and other cases, that the *Simmons* rule applies not just to the Fourth Amendment, but to any " 'benefit' . . . afforded by another provision of the Bill of Rights." The Eighth Amendment right to be free from excessive bail is a benefit afforded by a provision of the Bill of Rights. To allow the govern-

ment to use Dohm's testimony against him in this case creates the exact same "unacceptable risk of deterring the prosecution of marginal [constitutional] claims" that the Supreme Court designed the *Simmons* rule to prevent. Not applying the *Simmons* rule in this case also means that we are imposing a penalty "on the good-faith assertion of [Eighth] Amendment rights" which is " 'of a kind to which this Court has always been peculiarly sensitive'," 390 U.S. at 393, 88 S.Ct. at 976, "for it involve[s] the incrimination of the defendant out of his own mouth." *McGautha, supra*, 402 U.S. at 211–212, 91 S.Ct. at 1469.

Moreover, the main premise of *Simmons* is that a defendant faced with a "Hobson's choice" between incriminating himself and sacrificing one of his rights in the first eight amendments may choose to remain silent and sacrifice his constitutional claim. Thus, the effect of the *Simmons* rule is not to deprive the government of evidence it would otherwise have and be free to use, but rather it is to deprive it of evidence, the defendant's own testimony, which the government would not otherwise have obtained were it not for the unfortunate circumstance that the government happened to violate or threaten one of the constitutional rights of the defendant. It seems rather disingenuous, to say the least, for the government to attempt to limit the rule in *Simmons* by arguing that it has a right to convict a man with his own testimony which testimony would not even have been coerced into existence if the accused did not have a good faith belief that the government had, or was about to, violate one of his constitutional rights.

It must be remembered that the majority in this case does not contend that denying *Simmons*-type protection to the Eighth Amendment testimony of a defendant does not chill his testimony in a bail hearing.

---

11. Several times in its opinion the majority made clear it thought that Dohm spoke out solely because he honestly thought he should be given a lower bail than the amount recommended by the government.

12. The "necessity," or even value, of a defendant's testimony in a hearing in which the government must prove a film is obscene can hardly be compared to the importance of a defendant's testimony in a hearing in which a court must decide whether a defendant intends to appear for trial.

Rather it is the position of the majority that for some unimaginable reason a defendant need not testify to have reasonable bail set in his case, and that a court will be able to set reasonable bail even if it hears only an inherently biased, one-sided account of the facts. The majority is apparently content to render an Eighth Amendment hearing a de facto ex parte proceeding in which a defendant must sit silently, bound and gagged by circumstance, while the government provides the court with its side of the case, and in this case, with its own account of the defendant's out-of-court statements. In short, the majority contends that it is permissible to muzzle a defendant in a bail proceeding because it does not matter that he cannot speak. I dissent because I believe that it does matter.[13] It is not for luxury or ceremony that our judicial system is adversary in nature. The adversary design is grounded in the most fundamental interests of accuracy, fairness, and human dignity. Central in that system is the right of the citizen to be heard. The majority says that a defendant need not be heard on behalf of one of his constitutional rights because that right is guaranteed. But I say that it is only with due process that our constitutional guarantees can be transformed from promise to reality and from assurance to surety. It is not because his rights are guaranteed that this defendant can be silenced; on the contrary, it is because he can not be silenced that we can guarantee his rights.[13a]

## II.

Even if the majority's position on *Simmons* is adopted as a general rule, it was still error to admit Dohm's statements. Before Dohm spoke in his bond hearing he was advised by the magistrate on the application of the *Simmons* rule to the defendant's testimony in the bond hearing in a most confusing and at times self-contradictory manner. I quote the magistrate's statement in full, because no description of it could do it justice (much less render it just):

THE COURT: All right.

All right, gentlemen, if you wish I can give you a bond hearing at this time or you can wait until you get an attorney. That's your right.

If you feel like you may jeopardize anything or hurt yourself by answering questions under oath, then you certainly have the right to wait for a full bond hearing until you have your attorney with you.

If you wish, though—I will only take sworn testimony which subjects you to perjury, and I also advise you that you may not have an attorney and you may say something that might hurt you in future proceedings.

> Respondent suggests that, apart from the confession, there was adequate evidence before the jury to sustain the verdict. But where, as here, a coerced confession constitutes a part of the evidence before the jury and a general verdict is returned, no one can say what credit and weight the jury gave to the confession. And in these circumstances this Court has uniformly held that even though there may have been sufficient evidence, apart from the coerced confession, to support a judgment of conviction, the admission in evidence, over objection, of the coerced confession vitiates the judgment because it violates the Due Process Clause of the Fourteenth Amendment.

Id. 356 U.S. at 567–568, 78 S.Ct. at 850. See also *U. S. v. Gresham*, 585 F.2d 103, 109 n. 4 (5th Cir. 1978).

---

**13.** In this case in particular, where the government has emphasized the out-of-court statements of the accused in an effort to have a high bail set, it would seem all but impossible for a fair court to know what bail would be reasonable without hearing the defendant's side of the story.

**13a.** Since the constitutional violation in this case is the government's use at trial of Dohm's coerced confession, the harmless error rule in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), does not apply. The Court in *Chapman* said that the government's use at trial of a defendant's coerced confession involved a "constitutional right so basic to a fair trial that [its] infraction can never be treated as harmless error." Id. 386 U.S. at 23 & n. 8, 87 S.Ct. at 827–828 & n. 8. The Court cited for this proposition its opinion in *Payne v. State of Arkansas*, 356 U.S. 560, 78 S.Ct. 844 (1958), which said:

In other words, the law says that the testimony here really should be used against you at future proceedings, but I don't know how it can be done. Technically, they won't use it, but then they're here listening and there is a Government attorney and Government agents, so—

I do this because you don't have an attorney with you and we try to advise you and so on.

I'm either telling you to have your bond hearing now or not to. I'm just trying to advise you of the possibilities, then you make an intelligent decision.

The best that could be said for this statement is that it so confused the unrepresented defendant that he was left totally incapable of making a knowing, informed, and voluntary waiver of his Fifth Amendment rights.[14] What is even more likely though is that Dohm relied to some extent on the magistrate's statement that he would "only take sworn testimony which subject[ed] [Dohm] to perjury" and that "[t]echnically, [the government] won't use it". The defendant most likely relied as well on the magistrate's statement that he, the magistrate, did not "know how it [use of the evidence] can be done."

These comments by the magistrate are quite inexplicable. It would have been simple enough to say: anything you say may be used against you at trial, period. (Apparently this is the law, according to the majority.) Instead the magistrate's bewildering equivocation makes it clear that he himself was not sure what the law was.

Even if the law is that, in general, a defendant does not have a constitutional right to some sort of use immunity in a bond hearing, he certainly can not be bound by a Fifth Amendment waiver based on a magistrate's misstatement of the law, much less on the magistrate's implied or limited guarantee of some immunity. There is no more basic principle in the constitutional doctrine of voluntary waiver than that an unrepresented defendant can not make a knowing and voluntary waiver of a constitutional right if he is misinformed on the right by a judge or police officer the moment before he relinquishes it. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

### III.

Although not a primary basis of this dissent, I am also concerned about the fact that Dohm did not have, and was perhaps denied an opportunity to obtain, counsel for this critical bond hearing. Given this court's recent ruling in *Nash v. Estelle,* 597 F.2d 513 (en banc) (5th Cir. 1979) I think the instant case raises a serious question about whether Dohm was questioned by the court after he indicated he wanted a lawyer. Shortly before Dohm's preliminary and bond hearings, the following exchange took place between Dohm and the magistrate:

THE COURT: Do you have the money to hire an attorney?

MR. DOHM: I believe I do. I've got to find one.

The magistrate, however, then went on to conduct complicated preliminary hearings and bond hearings for Dohm and his three co-defendants, replete with witnesses, opportunities for cross-examination, and obscure (at best) discourses from the bench on the law. In addition, at the start of Dohm's bond hearing the magistrate directly solicited Dohm's testimony by asking him: "Anything you'd like to bring out that might help me in setting a reasonable bond?" The magistrate also asked Dohm a total of 28 other questions.

In *Nash v. Estelle, supra,* we reaffirmed the rule in *United States v. Priest,* 409 F.2d 491, 493 (5th Cir. 1969), which was quoted with approval in *Nash* as follows:

Where there is a request for an attorney prior to any questioning, as in this case, a finding of knowing and intelligent waiver

---

14. Although I stress the fact that Dohm was without counsel, I do not mean to imply that a lawyer could have understood the judge's statement any better than a layman. A lawyer, however, might have been more able or inclined to ask the magistrate to clarify his statements, or to explain the law himself more clearly to his client.

of the right to an attorney is impossible. . . . [T]he suspect has an absolute right to delay interrogation by requesting counsel. If such a request is disregarded and the questioning proceeds, any statement taken thereafter cannot be a result of waiver, but must be presumed a product of compulsion, subtle or otherwise. In *Nash* the majority modified (or clarified, depending on what view of the then current law one adopts) *Priest* by saying that, where a person expresses a desire for counsel in an ambiguous or equivocal manner, the government interrogator is permitted "to make further inquiry to clarify the suspect's wishes." *Id.* at 517. In other words, the interrogator may ask whether the person wants a lawyer immediately, in which case the interrogation must cease, or whether he wants to continue the interrogation without counsel and obtain a lawyer later. The burden is on the government to prove "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461. The Supreme Court has said many times that "the right to counsel does not depend upon a request by the defendant [cits. omitted] and that courts indulge in every reasonable presumption against waiver [cits. omitted]." *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977).

In the instant case Dohm explicitly told the magistrate "I've got to find [a lawyer]." Admittedly this is an ambiguous statement. It could mean that Dohm wanted to find a lawyer either immediately, or at least before future proceedings, or just some time in the future. However the magistrate did not seek to clarify Dohm's response. Instead he went on to interrogate Dohm with a total of 28 questions.

While I admit these facts raise at best a close question under *Priest* and *Nash*, I think the matter is changed entirely by the fact that Dohm was forced to choose between his Fifth and Eighth Amendment rights without benefit of counsel after expressing his desire for counsel. As I explain at length above, I do not think *Sim-* *mons* and the constitution permit the government to force a defendant to sacrifice one constitutional right in order to exercise another. But even if in this particular set of circumstances such an awesome, fateful and legally complex "Hobson's choice" can be forced on the defendant, I cannot conceive how we can deny the defendant a lawyer to assist him in understanding the choice and its profound consequences. Constitutional rights are not disjunctive or mutually exclusive. But if the majority is intent on making them so in this context, at the very least it should ensure the defendant's choice is an informed one. I think a court must obtain a clear and unambiguous waiver of counsel from a defendant before forcing him to choose between two guaranteed rights in the Bill of Rights. At the very least, a court should not press its interrogation with vigor without first clarifying the defendant's statement that he has "got to find" a lawyer.